597 So.2d 182 (1992)
Jimmy BASS and Markius Thomas
v.
STATE of Mississippi.
No. 89-KA-0244.
Supreme Court of Mississippi.
March 25, 1992.
Boyd P. Atkinson, Raymond L. Wong, Cleveland, for appellants.
Michael C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Ass't Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and SULLIVAN and McRAE, JJ.
HAWKINS, Presiding Justice, For the Court:
Jimmy Bass and Markius Thomas appeal from their convictions in the circuit court of the Second Judicial District of Bolivar County and sentences to twenty years for aggravated assault and thirty years for armed robbery. Upon this appeal we address the issues of the circumstances in which the juvenile record of a child witness is appropriate evidence on cross-examination, and whether a disturbance in the courtroom warrants a mistrial. Finding no error, we affirm.

FACTS
On July 17, 1988, Mary Townsend was working as a cashier at the "61 Quiki" convenience store in Cleveland, Mississippi. At approximately 10:30 p.m., three black males entered the store, and one of them ordered a hot dog. When Townsend went to fix the hot dog, one of the men told her: "I am going to rob you." She turned around, and he pointed a handgun at her and repeated: "I am going to rob you." He then told her to open the cash register and give him the money. She opened the register and started giving him the money. He grabbed the money, turned around and then shot Townsend twice. As the three men ran out the door, Townsend managed to push an alarm button and dial 911 before she became unconscious. Townsend was taken to the hospital where she underwent surgery to repair damage to her large and small intestines and large and small bowels.
Bass and Thomas were indicted October 26, 1988, by the grand jury of the Second Judicial District of Bolivar County in a two-count indictment, Count One charging them with aggravated assault in shooting *183 Mary Townsend, and Count Two armed robbery of Mary Townsend. At the time of the robbery, Townsend was an employee of Scott Petroleum, Inc., doing business as "Quicki Stop," or "61 Quiki." Bass and Thomas took $185.00 in cash from the store. Trial of the defendants began on Wednesday, December 7, 1988.
Fifteen-year-old Keith Thompson testified that he was in the vicinity of the 61 Quiki immediately after the robbery occurred. He testified that he was walking to another store to play video games when he saw Markius Thomas, Jimmy Bass and another male running down the highway away from 61 Quiki. Thompson testified that he had known Thomas and Bass a long time and recognized them as soon as he saw them. According to Thompson, Bass had what looked like a pistol in his hand and was trying to put it in his pocket while he ran. Thompson testified that he called Thomas and said: "Markius, come here," but Thomas told him that he would catch up with him later and kept running. Thompson also testified that about the time he saw the three blacks running, "I seen two police cars go to 61 Quiki." Thompson testified that he started to go to the 61 Quiki to see what happened but instead went home because he was afraid he might get into trouble. He also testified that the night before the robbery, Jimmy Bass let Thompson hold a .38 revolver which Bass had in his possession.
Bass testified that he was with Thomas during the afternoon of July 17, 1988, but that he and Thomas were both at their respective homes that night. Thomas did not testify. Thomas and Bass each put witnesses on the stand who testified that they were at home on the night of July 17, 1988.
On August 3 during the course of their investigation, the police questioned Thompson and a written statement was taken from him by George Serio, investigator with the Cleveland Police Department. In pre-trial discovery Thompson was listed as a potential State witness, and a copy of his written statement was furnished the defense.
The youth court records are not a part of this record, but there is reference made by defense counsel that at the time of trial Thompson had been in training school four times, twice for shoplifting, once for receiving stolen property, and another for not attending school. Counsel also told the court that Thompson was sent to the training school on October 12, 1988, for failure to attend school.
Thompson was returned from the training school to Cleveland to testify in this cause, and was in the local jail on Monday, December 5.
On direct examination Thompson testified that he was in jail when he was asked by his cousin, Cedric Coleman, to "[T]ell them you don't know nothing about it. You know, tell them that Serio tried to  told you that if you don't testify, he was going to try to do something to you."
Thompson was asked if Serio had done this, and he answered, "No, sir." He was then asked, "Has anybody with the police department or me told you to tell anything but the truth?" He answered, "No, sir."
On cross-examination Thompson was asked where he had been staying in Cleveland for the last two or three days, which was objected to; the objection sustained. The circuit judge then heard from counsel in chambers.
Defense counsel then unsuccessfully sought permission to cross-examine Thompson about his youth court record.
On their appeal Bass' and Thomas' first and main assignment of error is the refusal of the circuit judge to let them cross-examine Thompson on his juvenile record. Because this assignment presents both a serious and a close question, we quote at length from the trial record.

IN CHAMBERS
BY THE COURT:
At the present time the State's witness, Keith Thompson, is on cross-examination by Mr. Wong. And Mr. Wong was questioning Mr. Thompson about where he had been within the last two or three days and the District Attorney objected *184 and the Court understands that Mr. Wong was going to question Mr. Thompson about any former convictions he may have had as a juvenile, which we had discussed before, that the Court would have to make a determination at the right point, so this is the right point, Mr. Wong, would you state your reasons for the use of that testimony?
BY MR. WONG [counsel for Thomas]:
For the record, Your Honor, I had talked to Keith Thompson on 12/7/88[1] at 1859 hours in the jail or 6:59 p.m. At that time I asked him how many times he had been in training school and he said he had gone to training school four times. He is presently in training school since his adjudication by the Youth Court on October 12, 1988, for not going to school. He was brought back Monday, which is the 5th. He has two prior trips to the training school for two counts of shoplifting. He has gone to training school for the fourth time for receiving stolen property in November of 1987. Your Honor, we were now going to question  on my cross-examination on behalf of Mr. Markius Thomas, regarding his juvenile record to show any bias or interest but not for impeachment purposes as stated in the statute XX-XX-XXX subpart (5) supplement 1988.
... .
BY THE COURT:
All right. What bias or interest do you propose to show?
BY MR. WONG:
Your Honor, during my cross-examination, he has already stated that no promises were given to him. But it has come to my attention that he has asked for a stay at home. But he is under orders or he is in jail and is probably going to be returned back to training school and I need to ask him if he is going to stay at home.
BY THE COURT:
How would that show bias or interest with regard to the two defendants?
BY MR. WONG:
The only way he can stay home is if there is an agreement for him to stay home before he goes back to training school. That is one of the things that we are going to probe. Under Mississippi Rule 609(d) 
BY THE COURT:
 Now I am going to let you cross-examine the witness as to whether he has been shown any special treatment or not, but not, unless you can show me a good reason for it, why any former convictions. You can bring out bias or interest, but it has to be bias or interest with regard to this particular case. (Emphasis added)
BY MR. WONG:
If I may go further, Your Honor, as to an expansion of my cross-examination concerning his juvenile adjudications, though, Mississippi Rules of Evidence 609(d) says, "the evidence of a juvenile's adjudication generally is not admissible, but in a criminal case the Court may allow, other than the criminal defendant  the conviction of the offense would be admissible to attack the credibility of an adult and the Court is satisfied that the admission in evidence is necessary for a fair determination of the issue of guilt or innocence in this case." Your Honor, this is a capital case. We cite subsequent authority, the case of Hamburg vs. State, 248 So.2d 430. (Mr. Wong reading aloud from that case.) (Mr. Wong cites Davis vs. Alaska, 415 U.S. 308 [94 S.Ct. 1105, 39 L.Ed.2d 347.]) (Mr. Wong cites 609.8 at page 503 of West Federal Evidence.) I will state this for the record, whether a fair determination of guilt or innocence requires the employment of a juvenile conviction to attack the credibility of a witness other than a criminal defendant on the basis of either bias or willingness to disobey the law must be determined by the *185 Court on the facts of the particular case, whether the rehabilitant process has been demonstrated a failure and the importance of the witness' testimony are relevant considerations.
Your Honor, we state that a fair determination of guilt or innocence of, at least, my client  and Mr. Atkinson joins in this motion  we need to go in and dwell [sic] into the juvenile adjudications concerning this individual. And this will make a fair determination of the issue of guilt or innocence of at least my client. The Mississippi Supreme Court has stated in Peterson vs. State, 518 So.2d 632, a 1987 Mississippi case, lists the four factors to consider, which has been expressed in a Fifth Circuit opinion. That is our position on this matter, Your Honor. (Emphasis added)
BY MR. ATKINSON [counsel for Bass]:
Your Honor, I think peripherally we don't need to lose sight of the fact that the little fellow on the witness stand has already blurted out twice when he was in jail. The jury I think needs to know  the first time I think he said he was in jail, he was talking about when the police came to him asking him about any knowledge and he talks about  when Mr. Mellen was trying to impeach him up there, he talked about being in jail. I think that in itself opens the door wide open for us to be able to ask him what's he doing in jail.
BY THE COURT:
All right, Mr. Mellen.
BY MR. HORAN [Assistant D.A.]:
I am going to address this point. Under 609, Your Honor, the fact that this witness is not even an adult, would take it out of that rule, starting off, the fact that he is only 15 years old. And the purpose of 609 is [to] keep juvenile adjudications from coming back to haunt an adult. And Kee Kee is 15 years old and he hasn't reached the age of eighteen yet. Also, I don't see where the convictions of shoplifting or not going to school comes to the level of any conviction that could be used against an adult, which is required under 609, and considering the fact that the statute, the 561 statute, has not been amended and the fact that the rule would come into place. I think rule 609(d) is the proper authority to consider on this matter and the fact that he didn't go to school is really not relevant even though it has been brought out that he is in jail and any bias or interest, that even if 561 was the controlling law, Mr. Wong has not sufficiently stated what bias or interest is involved here. Also, I don't think he is saying that we promised Kee Kee anything, are you, Mr. Wong?
BY MR. WONG:
All I am saying is, I don't know what Kee Kee is going to say from the stand.  I don't know if Mr. Horan is through 
BY MR. HORAN:
 under both authorities he stated and I don't think that any of that law that he has cited is going to be a juvenile on the stand. I don't know if he can tell us whether that witness is being attacked as a juvenile or an adult. Do you know, Mr. Wong?
BY MR. WONG:
I am going 
BY THE COURT:
 well, he said he was 15 years old.
BY MR. HORAN:
Well, I am talking about his authority that he is saying that can be attacked. Anyway, if he is going to go into any promises, I think that would be improper if he has some basis for anything that we have made a promise, that needs to be disclosed. He doesn't need to just ask, open-ended, whether or not we made any promises, which we have not made him any promise.
BY THE COURT:
First of all, Section 43-21-561, Mississippi Code of 1972 was passed in 1980 and so far as I know, and I was looking in the back of the code to be sure, has not been amended  (Court looking at the code) and the 1988 supplement does not show that it was amended. The rule[s] of evidence, when they were adopted by the Mississippi Supreme Court, repealed *186 all laws, rules and directions and anything else that were in conflict with them. I am not saying this statute is in conflict as far as showing bias and interest is concerned. I think the defense has a right to cross-examine the witness as to any bias or interest which would include any possible offers or would induce him to testify for the state. It is cross-examination and you have the right to ask him about that, if anybody has made him any offers or concessions and to test his credibility in that way. So that part of the statute is not in conflict with the rule. As I have already said, I will allow you to cross-examine him, both you and Mr. Atkinson. Beyond that, I do think that Rule 609 does control and they are basically in accord with what 561 says and, that is, evidence of juvenile adjudication is generally not admissible under this rule, unless you can show bias or interest. What the Mississippi Supreme Court has said, in addition to that, they do not want to try defendants, or for that matter, witnesses,  what they want is something that will go to credibility. If a former conviction would go to credibility of a defendant, what is known as a crimen falsi, whether he be adult or juvenile, it could be used. In this case, we have a conviction for receiving stolen property and for shoplifting. They are not the type of crime that the Court would consider crimen falsi or adjudications that go to the credibility of the witness so far as the type of crime is concerned. So the Court is going to rule that you cannot bring out any former convictions. As far as the fact that he was in jail, I don't recall when it was first said, but at least on two or three occasions, it has been brought out that he was in jail. So to that extent, it has already been shown to the jury that he is either charged or has been convicted of something and I don't think anymore reference should be made to where he was questioned or anything of that sort. More has come in about it than it really should have already. But you certainly can cross-examine him as to his credibility, to test his truthfulness, to test his bias or any prejudice, or interest that he might have in this case. (Emphasis added)
BY MR. ATKINSON:
Your Honor, even with the witness stating in direct examination of the District Attorney that he was in jail. We are precluded from going into that on cross-examination?
BY THE COURT:
Yes, sir. It has been gone into more than it should have been gone into already. It is done to protect the witnesses who will later become grown people, as Mr. Horan pointed out. It has been gone into by Mr. Wong. He asked him if he was in a cell when he questioned him. I am saying don't refer to it anymore. That is as far as we need to go.
BY MR. WONG:
Your Honor, as far as the 6th Amendment claim 
BY THE COURT:
 you have a right to cross-examine him. I told you you could cross-examine him and you have already cross-examined him. The 6th Amendment has already been complied with. You are confronting the witness and you are asking him questions, but there is a limit to what you can ask about former convictions and that is to protect the juvenile.
BY MR. WONG:
Your Honor, just for clarification, then, you are saying that the Hamburg case is not controlling in this case 
BY THE COURT:
 I sure am.
While the above proceedings were taking place, the circuit judge was informed by a deputy that one Frederick Norman, a defense witness, had been been seen talking to Thompson. Norman was brought in for questioning in chambers concerning this and admonished not to talk to the witnesses, either state or defense.
Following this, Thompson was cross-examined before the jury.

*187 Q. And Kee Kee, you didn't really want to come in here and testify today, did you?
A. It didn't make me no difference because they was just telling me that I had to come and testify.
Q. You had to come and testify?
A. They said, you know, you've got to testify in the case that happened at 61 Quiki since you seen something took place.
Following their trial, the jury returned a verdict of guilty against both defendants and they were each sentenced to twenty years in prison for the aggravated assault charge and thirty years for the armed robbery charge.

LAW
Mississippi Rules of Evidence (M.R.E.) 103(a)(2) states:
(a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.
This rule is a restatement of our case law. Johnson v. State, 416 So.2d 679, 681 (Miss. 1982). See also Gates v. State, 484 So.2d 1002, 1008 (Miss. 1986); Hammond v. Grissom, 470 So.2d 1049, 1053 (Miss. 1985); Brown v. State, 338 So.2d 1008, 1009-10 (Miss. 1976); Martin v. Wadlington, 337 So.2d 706, 708 (Miss. 1976); Dazet v. Bass 254 So.2d 183, 187-88 (Miss. 1971).

I. JUVENILE RECORD OF WITNESS
Until the adoption of the Mississippi Rules of Evidence January 1, 1986, the general credibility of any adult witness could be attacked by questioning him as to any previous conviction, whether a felony or a misdemeanor, with the sole exception of traffic offenses. Miss. Code Ann. § 13-1-13 (1972); Miss. Code Ann. § 63-9-15 (1972) (now repealed); Breland v. State, 221 Miss. 371, 73 So.2d 267 (1954); Brown v. State, 96 Miss. 534, 51 So. 273 (1910).
A different rule applied, however, as to youth court offenses. Miss. Code Ann. § 43-21-561(5) (Supp. 1979) provided:
(5) No adjudication upon the status of any child shall operate to impose any of the civil disabilities ordinarily imposed on an adult because of a criminal conviction, nor shall any child be deemed a criminal by reason of adjudication, nor shall such adjudication be deemed a conviction. A person in whose interest proceedings have been brought in the youth court may deny, without any penalty, the existence of those proceedings and any adjudication made in those proceedings. Except for the right of a defendant or a prosecutor in criminal proceedings and a respondent or a youth court prosecutor in youth court proceedings to cross-examine a witness, including a defendant or a respondent, to show bias or interest, no adjudication shall be used for impeachment purposes in any court.
As can be seen from this statute, a youth court adjudication can be used to cross-examine a witness in a criminal proceeding to show "bias or interest."
And, as to adult witnesses, M.R.E. 609 removes the absolute, carte blanche right to use prior convictions for impeachment purposes, substituting a balancing test explicated in Peterson v. State, 518 So.2d 632 (Miss. 1987).
As to youth court adjudications, M.R.E. 609(d) and the comment thereto provides:
Evidence of juvenile adjudications is generally not admissible under this rule. The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission into evidence is necessary for a fair determination of the issue of guilt or innocence.
The official comment to Rule 609(d) provides:

*188 Subsection (d) prohibits impeachment based on juvenile adjudications. Reasons for this rule include the wish to free an adult from bearing the burden of a youthful mistake, the informality of youth court proceedings, and the confidential nature of those proceedings.
In pre-rule Mississippi practice, the use of juvenile adjudications for impeachment purposes has been governed by M.C.A. § 43-21-561 which provides that no adjudication against a child shall be deemed a criminal conviction. Indeed, the juvenile offender is permitted by statute to deny the fact of the prior adjudication. However, the statute permits cross-examination by either the state or the defendant in a criminal action or the respondent in a juvenile adjudication proceeding regarding prior juvenile offenses for the limited purpose of showing bias and interest. In short, the evidence could be used in these limited circumstances but not to attack the general credibility of the witness.
Under Rule 609(d) the court has the discretion to allow impeachment of a witness, other than a criminal defendant, by a prior juvenile adjudication if the judge determines that it is necessary. The court's discretion extends only to witnesses other than the accused in a criminal case.
This rule authorizes cross-examination of a youth court offender if it would have been "admissible to attack the credibility of an adult and the court is satisfied that admission of the evidence is necessary for a fair determination of the issue of guilt or innocence."
Miss. Code Ann. § 43-21-561(5) and Rule 609(d) serve the same purpose, have the same objective, and although worded differently, provide the same general criterion for a trial judge in exercising his discretion to determine whether or not a previous youth court adjudication shall be admissible in the cross-examination of a minor witness. The only difference is that under the Rule an accused may not be cross-examined as to his prior youth court adjudications.
The right to cross-examine as to prior convictions in order to show bias or interest was given Constitutional dimension in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Because the rule announced in that case is a right guaranteed an accused under the Sixth Amendment, it should be interpreted liberally to favor the accused. Davis v. Alaska, however, does not give the accused the absolute right under Miss. Code Ann. § 13-1-13 or pre-rules case law to require a witness to disclose any prior convictions to attack his credibility simply because he had been convicted of a criminal offense.
In Davis v. Alaska a 16-year-old boy named Green spoke to two men beside a parked car near his house as he was leaving on an errand. When he returned they were still there, and one had a crowbar. Later, a safe from the "Polar Bar" restaurant was found near the spot where Green had seen the two men. These men were subsequently indicted for burglary and larceny of the restaurant. At the time of their trial, Green was on probation by order of a juvenile court as a delinquent for having burglarized two cabins.
The State moved the trial court for a protective order to prevent any reference during Green's cross-examination to his juvenile court record. The U.S. Supreme Court noted:
In opposing the protective order, petitioner's counsel made it clear that he would not introduce Green's juvenile adjudication as a general impeachment of Green's character as a truthful person but rather, to show specifically that at the same time Green was assisting the police in identifying petitioner he was on probation for burglary. From this petitioner would seek to show  or at least argue  that Green acted out of fear or concern of possible jeopardy to his probation. Not only might Green have made a hasty and faulty identification of petitioner to shift suspicion away from himself as one who robbed the Polar Bar, but Green might have been subject to undue pressure from the police and made his identifications under fear of possible *189 probation revocation. Green's record would be revealed only as necessary to probe Green for bias and prejudice and not generally to call Green's good character into question.
415 U.S. at 311, 94 S.Ct. at 1108, 39 L.Ed.2d at 351.
The Court then noted:
Although prevented from revealing that Green had been on probation for the juvenile delinquency adjudication for burglary at the same time that he originally identified petitioner, counsel for petitioner did his best to expose Green's state of mind at the time Green discovered that a stolen safe had been discovered near his home. Green denied that he was upset or uncomfortable about the discovery of the safe. He claimed not to have been worried about any suspicions the police might have been expected to harbor against him, though Green did admit that it crossed his mind that the police might have thought he had something to do with the crime.
415 U.S. at 312, 94 S.Ct. at 1108, 39 L.Ed.2d at 351.
By specific questions Green was asked if, following discovery of the safe, he was upset that it was found on his property; whether he felt that he might be a suspect; whether he was uncomfortable; whether he suspected that the police thought he was involved; and if he was somehow connected with the theft. He was asked again if there was a possibility somehow that the police might think he was connected with the theft, and he testified that this had crossed his mind. Finally, he was asked if he had ever been questioned before by law enforcement officers, and he answered no. The Court sustained an objection to this question, and then noted:
Since defense counsel was prohibited from making inquiry as to the witness' being on probation under a juvenile court adjudication, Green's protestations of unconcern over possible police suspicion that he might have had a part in the Polar Bar burglary and his categorical denial of ever having been the subject of any similar law enforcement interrogation went unchallenged. The tension between the right of confrontation and the State's policy of protecting the witness with a juvenile record is particularly evident in the final answer given by the witness. Since it is probable that Green underwent some questioning by police when he was arrested for the burglaries on which his juvenile adjudication of delinquency rested, the answer can be regarded as highly suspect at the very least. The witness was in effect asserting, under protection of the trial court's ruling, a right to give a questionably truthful answer to a cross-examiner pursuing relevant line of inquiry; it is doubtful whether the bold "No" answer would have been given by Green absent a belief that he was shielded from traditional cross-examination. It would be difficult to conceive of a situation more clearly illustrating the need for cross-examination.
415 U.S. at 313-14, 94 S.Ct. at 1109, 39 L.Ed.2d at 352.
The Court then held:
Cross-examination is the principle means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness. By so doing the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony. The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness. A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices or ulterior motives of the witness as they may relate *190 directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is `always relevant as discrediting the witness and affecting the weight of his testimony.' ... We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. (Emphasis added)
415 U.S. at 316, 94 S.Ct. at 1110, 39 L.Ed.2d at 353-354.
The Court then concluded that "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony," which was crucial to the State's case. 415 U.S. at 317, 94 S.Ct. at 1111, 39 L.Ed.2d at 354. The Court noted that while defense counsel was permitted to ask Green if he was biased, he was not permitted to "make a record from which to argue why Green might have been biased or otherwise lacked the degree of impartiality expected of a witness at trial." 415 U.S. at 318, 94 S.Ct. at 1111, 39 L.Ed.2d at 355.
The Court then held that the Sixth Amendment right to confrontation had been denied because the defense had not been permitted to show a possible bias on the part of Green. 415 U.S. at 320, 94 S.Ct. at 1112, 39 L.Ed.2d at 356.
Because it is a polestar decision, and because of the similarities between Davis v. Alaska and this case, we specifically have given careful attention to the facts and trial records of that case, and quoted at length from the Court's opinion. As can be seen from the extended excerpts from Davis v. Alaska and the record in this case, there is a great similarity between the two. There are also differences.
In Davis v. Alaska, Green, the 17-year-old witness, was on probation; in this case Thompson was brought from the training school to testify for the state. This in and of itself is not dispositive. In Davis v. Alaska the state sought and obtained a protective order to keep the defense from questioning Green about his youth court record. No such protective order was sought here, although the State did object to cross-examining Thompson about his youth court record, which was sustained by the circuit court. Neither is this difference dispositive.
In Davis v. Alaska defense counsel specifically informed the court that the reason he wanted to question Green was not for general impeachment of his character, but to show his state of mind when he was questioned by the police. Specifically, he wanted to show that Green was himself on probation for burglary, from which defense counsel wished to show, or at least be able to argue to the jury, that Green's cooperation with the police was brought on by his fear of probation revocation or himself being suspected of the burglary. No such basis was offered by the defense in this case. Counsel simply told the court that they wished to cross-examine Thompson about all his convictions to show "bias or interest." In Davis v. Alaska Green had himself been sent to reform school for burglary. He was questioned about a burglary when the safe was found on his parents' property. There were no eyewitnesses to the burglary, and Green thought he might himself be suspected of the crime. Thompson had no reason to think in this case he might be suspected of the assault and robbery.
In this case the circuit court clearly told defense counsel they could cross-examine Thompson to show special treatment, offers or concessions, or to show any bias or interest, but could not just ask him about his juvenile court record. The trial court in Davis v. Alaska offered no such opportunity to the defense.
In Davis v. Alaska, following the trial court's ruling, defense counsel did on cross-examination seek to probe Green's state of mind when he was questioned by the police, and asked him if he had ever been questioned by the police before, to which he answered "no," and the court sustained the objection thereto. In this case defense counsel neither in chambers nor out of the presence of the jury made any profert of what they expected to show by cross-examining Thompson as to his youth court *191 record, except a generalized statement to show "bias or interest." Did they expect to show he had been promised anything to testify? Did they expect to show he wanted to return home from the training school, and thought if he testified for the state he would be shown leniency? None of this was brought to the attention of the circuit judge.
Finally, in this case, counsel did not, as was done in Davis v. Alaska, attempt before the jury to explore Thompson's state of mind when he was questioned by the police or the state. In this case, weeks in advance of trial defense counsel was furnished the name of Thomas as a potential witness for the State and received a copy of his written statement to the police department. They had ample opportunity to interview him, question him in advance of trial, and learn enough about him, explore his background and test the credibility of what he proposed to testify, and to give the court some specific reason or basis, if they had one, why they wished to ask him about his juvenile court record. This was not done. Circuit judges should not be sandbagged into committing error. M.R.E. 103(a)(2); Johnson, 416 So.2d at 681.

II. COURTROOM DISTURBANCE
Bass and Thomas also contend that the trial court erred in refusing to grant a mistrial after a disturbance occurred in the courtroom. During Bass' cross-examination of prosecution witness Anita Thompson, Thompson started crying when Bass sought to elicit testimony as to whether anyone tried to influence her testimony. When Thompson mentioned the name "Tyrone," an unidentified spectator ran out of the courtroom and was followed by a law enforcement officer. After this disturbance, the court recessed for lunch. After the recess, the court stated that it had decided to clear all of the spectators out of the courtroom for the remainder of the trial. The attorneys for Bass and Thomas moved for a mistrial. They argued that the disturbance unfairly prejudiced the minds of the jurors against Bass and Thomas. This motion was overruled.
The general rule is that it is the duty of the trial court to maintain order in the courtroom and to take appropriate action when disturbances occur. 23 C.J.S. Criminal Law § 970. Rule 5.15 of the Mississippi Uniform Criminal Rules of Circuit Court Practice provides that "[t]he court shall declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceeding or conduct inside or outside the courtroom resulting in substantial and irreparable prejudice to the defendant's case." In Ladner v. State, 584 So.2d 743, 753 (Miss. 1991), this Court held that it will not reverse on the failure to grant a mistrial unless the trial court abused its discretion in overruling the motion for a mistrial. See also Horne v. State, 487 So.2d 213, 214-15 (Miss. 1986); Coley v. State, 378 So.2d 1095, 1097 (Miss. 1980); Logsdon v. State, 183 Miss. 168, 170, 183 So. 503 (Miss. 1938). In Davis v. State, 530 So.2d 694, 697 (Miss. 1988), quoting Schwarzauer v. State, 339 So.2d 980, 982 (Miss. 1976), the Court stated: "[t]rial judges are peculiarly situated so as to decide (better and more logically than anyone else) when a trial should be discontinued."
In this case, the trial court stated that it did not feel that the disturbance would cause substantial prejudice to Thomas and Bass because it was unlikely that the jurors even realized exactly what took place. The court did not abuse its discretion in refusing to grant a mistrial. After the disturbance, the court recessed for lunch. The court also cleared the spectators from the courtroom for the remainder of the trial in order to preclude another disturbance. The court was in the best position to decide what action needed to be taken and did take reasonable action.
After a careful study of the record, we find that the remaining assignments of error are without merit.
AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
NOTES
[1] Counsel is probably incorrect on the precise date he questioned Thompson. Trial began on December 7.