944 So.2d 928 (2006)
William HAWTHORNE, Appellant
v.
STATE of Mississippi, Appellee.
No. 2003-KA-02550-COA.
Court of Appeals of Mississippi.
December 12, 2006.
*929 Aelicia L. Thomas, attorney for appellant.
Office of the Attorney General by John R. Henry, attorney for appellee.
Before LEE, P.J., IRVING and ISHEE, JJ.
IRVING, J., for the Court.
¶ 1. Following a jury trial, William Hawthorne was convicted of aggravated assault and was sentenced by the Sunflower County Circuit Court to twenty years in the custody of the Mississippi Department of Corrections. Aggrieved, Hawthorne appeals and asserts that the trial court erred in excusing a juror, and in refusing to grant his motions for a mistrial, a directed verdict, and a judgment notwithstanding the verdict. Hawthorne also asserts that the jury's verdict was against the overwhelming weight of the evidence.
¶ 2. We find no error; therefore, we affirm Hawthorne's conviction and sentence.

FACTS
¶ 3. On the morning of March 22, 2003, Earnestine Woodard and her nephew, twelve-year old Demetrius Woodard, left her home to spend the day fishing. Hawthorne, the father of Woodard's two children, joined Woodard and Demetrius at around 2:30 p.m. and fished with them for about an hour. Shortly after Hawthorne left, Woodard and Demetrius returned to her home. Woodard put the fish they had *930 caught in the freezer and prepared to go to a casino in Greenville, Mississippi with Bobbie Pitts and Pitts' sister.
¶ 4. At trial, Woodard testified that she was she traveling north on Highway 49 toward Blaine, where she and Pitts were going to pick up Pitts' sister. While driving, Woodard testified that she saw Hawthorne, who was headed in the opposite direction, toward Sunflower. Woodard testified that, after seeing her vehicle pass him, Hawthorne turned around and started to follow her.[1] As they neared Blaine, Woodard was unable to leave Highway 49 to get Pitts' sister, because Hawthorne was tailing Woodard. As a result, Woodard continued to drive into Doddsville, where she turned around to go back to Blaine. On the way back to Blaine, Woodard testified that Hawthorne attempted to run her car off the road.
¶ 5. In an attempt to get away from Hawthorne, Woodard and Pitts drove to W.M. Pratt's house in Blaine, where they believed they would be safe. Upon their arrival at Pratt's house, both Woodard and Pitts exited the vehicle. Woodard testified that she then told Hawthorne to leave them alone and to stop following them. Pitts and Woodard both attempted to make their way into Pratt's house; Pitts made it inside, but Woodard was confronted by Hawthorne as she reached the steps of the house. As Woodard attempted to enter the house, she turned and saw Hawthorne pointing a gun at her. Woodard said that she asked him not to shoot her, but he pulled the trigger anyway, hitting her in the right arm. Woodard slipped and fell as she tried to run into the house. Hawthorne then shot Woodard in her lower back, chest, rib area, and left shoulder.
¶ 6. Woodard testified that she kicked the gun out of Hawthorne's hand just as he was about to shoot her a sixth time. Woodard attempted to shield herself between her vehicle and Pratt's vehicle, but Hawthorne grabbed her from behind, hit her in the head, and slammed her to the ground. Hawthorne then proceeded to stomp the side of Woodard's face with the heel of his boot. Woodard stayed on the ground, pretending to be dead, and Hawthorne fled the scene.
¶ 7. According to Woodard, she did not know why Hawthorne attacked her. Woodard testified that Hawthorne had never threatened her on any previous occasion. However, Demetrius testified that Hawthorne told him, prior to the shooting, that he was going to kill Woodard. Demetrius confirmed that Woodard was not present when Hawthorne made this statement.
¶ 8. Several individuals testified that they witnessed the shooting by looking out of the house's windows. All of the witnesses, as well as the officers who responded to the incident, testified that Woodard did not have a weapon in her possession at the time of the shooting. The witnesses also testified that Woodard covered her face with her hands during the shooting.
¶ 9. Shortly after Hawthorne fled, emergency personnel arrived at the scene. Woodard was taken to a hospital, and was later transferred to a different hospital. Two days after the shooting, Woodard was released from the hospital. Dr. Allen Billsby testified that Woodard suffered five gunshot wounds, three of which left both entrance and exit wounds. Several of the bullets remain inside Woodard to the present.
*931 ¶ 10. Hawthorne turned himself in to the Sunflower County Sheriff's Department the day after the shooting. Hawthorne provided a written statement to Bennie Walker, a deputy sheriff with the Sunflower County Sheriff's Department at the time of the incident.[2] In the statement, Hawthorne admitted that he argued with Woodard and that he shot her several times. Hawthorne never mentioned in his written statement that Woodard had a weapon at the time of the shooting, even though he claimed at trial that he shot her in self-defense because she had a fishing knife.

ANALYSIS AND DISCUSSION OF THE ISSUES
1. Excusing Juror For Cause
¶ 11. Hawthorne contends that the trial court erred in excusing a juror, Lucette Townsend, for cause after she stated that she could not sit in judgment of another person. Hawthorne argues that the trial court abused its discretion in replacing Townsend with an alternate juror because Townsend was replaced simply to prevent her from being inconvenienced. Hawthorne also contends that the trial court erred by failing to further examine Townsend to determine the reason why she felt that she could not serve on the jury. Despite Hawthorne's contention, the record reflects that Townsend was excused because she adamantly stated that she would not be able to judge Hawthorne fairly, and that she could not vote to deprive a person of his liberty. Thus, Townsend had no intention of following the law. Townsend also stated that if she were to remain on the jury, the trial would likely end with a hung jury.
¶ 12. All prospective jurors were asked on voir dire whether anyone had a problem being fair and impartial; however, Townsend did not bring to the court's attention her reservations about serving on the jury until after all peremptory challenges had been used and the jury had been impaneled.
¶ 13. Mississippi Code Annotated section 13-5-67 (Supp.2006) provides in part that "alternate jurors . . . shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties." Townsend was excused immediately following the impaneling of the jury; thus, the trial judge was clearly within the time frame provided in section 13-5-67. In addition, Mississippi Code Annotated section 13-5-79 (Supp.2006) states that "[a]ny juror shall be excluded . . . if the court be of the opinion that he cannot try the case impartially, and the exclusion shall not be assignable for error."
¶ 14. It has long been recognized as a fundamental principle of law that every defendant is entitled to a fair trial by an impartial jury. Reed v. State, 764 So.2d 496, 499 (¶ 9) (Miss.Ct.App.2000) (citing Collins v. State, 99 Miss. 47, 50, 54 So. 665, 665 (1910)). "The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by the both the state and federal constitutions." Id. (citing Simon v. State, 688 So.2d 791, 803 (Miss.1997)). "A person is competent to be a juror if the juror has no interest, bias or prejudice in the prosecution, and the juror has no desire to reach a result other than that gained from the evidence and the law in the case." Id. (citing Johnson v. State, 666 So.2d 784, 794 (Miss.1995)).
*932 ¶ 15. An issue similar to the issue in this case was presented to this Court in Reed v. State, 764 So.2d 496 (Miss.Ct.App. 2000). In Reed, a juror's prejudice in favor of a defendant was not disclosed until after the conclusion of voir dire. Id. at 501 (¶ 18). On appeal, Reed claimed that the court "should have found out [that the juror] had a bias before the end of voir dire." Id. We found that, regardless of the fact that the juror's prejudice was discovered only after voir dire, the juror was properly excused. Id. We noted that "[i]t is not constraint to refuse to allow an impartial juror to sit on a jury; it is insuring the proper operation of the justice system." Id. at 501 (¶ 19). Reed is also similar in that the juror's prejudice in Reed was in favor of the defendant, as the juror's personal conviction here would have operated in Hawthorne's favor. Id. We noted that it did not matter that the juror's prejudice would have proven beneficial for the defendant. Id. This Court stated, and now reiterates, that allowing an incompetent juror to serve would corrupt the judicial process, even if the prejudice works in favor of the defendant. Id.
¶ 16. In light of the statements made by the juror, and upon finding that the trial judge properly examined Townsend, we conclude that the judge did not abuse his discretion in granting the State's motion to excuse her for cause.
2. Motion for Mistrial
¶ 17. Hawthorne contends that the jury was tainted by Townsend's angry outburst. Following Townsend's actions, the trial judge admonished the jury to disregard her comments. In addition, the judge asked the jury if Townsend's comments affected their ability to serve as a juror, and no juror responded affirmatively. Nevertheless, Hawthorne moved for a mistrial, arguing that the statements were sufficient grounds to declare a mistrial.
¶ 18. The Mississippi Supreme Court has held that it will only reverse the trial court's failure to grant a mistrial in instances where the trial court abused its discretion in overruling the motion. Bass v. State, 597 So.2d 182, 191 (Miss.1992) (citing Ladner v. State, 584 So.2d 743, 753 (Miss.1991)). Townsend's comments were not directed toward Hawthorne, and it is clear that Townsend simply did not wish to serve on the jury. Thus, the trial judge did not abuse his discretion in admonishing the jury and allowing the trial to proceed as scheduled.
3. Motion for Directed Verdict
¶ 19. Hawthorne contends that the trial court erred in failing to grant his motion for a directed verdict; however, the record does not reflect that the trial court ruled on the motion. Rule 2.04 of the Uniform Rules of Circuit and County Court provides, "[i]t is the duty of the movant, when a motion or other pleading is filed, including motions for a new trial, to pursue said motion to hearing and decision by the court." Therefore, pursuant to Rule 2.04, this issue is procedurally barred. Nevertheless, procedural bar notwithstanding, we find that the evidence was sufficient to support the jury's verdict, and Hawthorne's contentions to the contrary are without merit.
¶ 20. A motion for a directed verdict challenges the legal sufficiency of the trial court's ruling. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). We find that the evidence is sufficient to sustain the trial court's denial of a motion for a directed verdict where "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 *933 L.Ed.2d 560 (1979)). In Bush, the Mississippi Supreme Court stated, "if a review of the evidence reveals that it is of such a quality and weight that, `having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded [persons] in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient." Id. (quoting Edwards v. State, 469 So.2d 68, 70 (Miss.1985)). This Court reviews the evidence in the light most favorable to the prosecution. Id.
¶ 21. Hawthorne contends that the trial court's verdict should not stand because a "fair-minded" jury could have concluded that he acted in self-defense. As support for his contention that Woodard had a knife at the time of the attack, Hawthorne points out that Woodard always takes a knife with her when she goes fishing. However, Hawthorne fails to recognize that Woodard was not fishing at the time of the attack. Woodard testified that she had taken the fish home and was going out for the evening when she was attacked by Hawthorne.
¶ 22. Hawthorne's contention that the State provided no testimony other than Woodard's to prove that she was not the aggressor is simply not true. The State produced four witnesses, in addition to Woodard, all of whom testified that Woodard did not have a knife, or any other weapon, at the time of the incident. Hawthorne points out that Troy Wilkinson, who was present at the house and witnessed the incident, testified on cross-examination that "it was probably true" that Woodard could have had a weapon before he saw her. However, upon thorough review of Wilkinson's testimony, we find that he also stated that he had never known Woodard to carry a weapon, nor did he see Woodard with a knife at the time of the attack. Furthermore, no knife was found at the scene. Wilkinson also testified that, as Woodard was being shot, she covered her face with her hands and rolled on the ground.
¶ 23. Notably, in his statement, Hawthorne never mentioned that Woodard had a knife. Similarly, Hawthorne did not mention anything to Hessie Murry[3] about Woodard having a knife.
¶ 24. Based on the evidence recounted above, we find that a rational trier of fact could have found the essential elements of the crime of aggravated assault beyond a reasonable doubt.[4]
4. Weight of the Evidence
¶ 25. "When reviewing a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand will sanction an unconscionable injustice." Bush, 895 So.2d at 844 (¶ 18) (citing Herring v. State, 691 So.2d 948, 957 (Miss.1997)). Whether to grant the motion is within the discretion of the trial court and should be granted "only in exceptional cases in which the evidence preponderates heavily against the verdict." Id. (quoting Amiker v. Drugs For Less, Inc., 796 So.2d 942, 947 (¶ 18) (Miss.2000)).
¶ 26. In light of the above discussion, and viewing the evidence in the light most *934 favorable to the prosecution, we find that Hawthorne's conviction is not against the overwhelming weight of the evidence, and allowing it to stand will not sanction an unconscionable injustice.
¶ 27. THE JUDGMENT OF THE CIRCUIT COURT OF SUNFLOWER COUNTY OF CONVICTION OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO SUNFLOWER COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] By contrast, Pitts testified that Hawthorne was parked on a dirt road between Blaine and Sunflower, and that he turned off the dirt road to follow them when he saw Woodard's vehicle.
[2] Hawthorne asked Walker to write the statement for him because his writing skills are limited.
[3] Murry was the deputy from the Sunflower County Sheriff's Department who accompanied Hawthorne to the location of the gun which was used in the shooting.
[4] Mississippi Code Annotated section 97-3-7 (Rev.2006) defines aggravated assault as "attempt[ing] to cause or purposely or knowingly caus[ing] bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm. . . ."