# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-00534-SCT

*JAYVIOUS JOHNSON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/03/2017 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH, III |
| TRIAL COURT ATTORNEYS: | ALISON LESLIE FLINT |
| | WILBERT LEVON JOHNSON |
| | WILLIAM R. LABARRE |
| | JAMIE MARIE BANKS |
| | BRENDA FAY MITCHELL |
| | KELLIE WILLIAMSON KOENIG |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/21/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS AND KING, P.JJ., AND COLEMAN, J.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Jayvious Johnson was convicted of two counts of capital murder with firearm enhancement, one count of kidnapping with firearm enhancement, and one count of

conspiracy. The verdicts are not against the overwhelming weight of the evidence, and the trial court did not commit reversible error on the evidentiary issues Johnson raises. This Court therefore affirms Johnson's convictions.

## FACTS AND PROCEDURAL HISTORY

¶2. In the early morning of November 12, 2013, Tavoris Marshall (Marshall) and Kevion Gorman were shot and killed. Jayvious Johnson (Johnson), Dbryus Story, Jamario Hodges, and Favian Vaughn were indicted for conspiracy to commit robbery, capital murder with firearm enhancement, and kidnapping with firearm enhancement. A joint trial for Johnson, Story, and Hodges was held in December 2016. Vaughn pled guilty to accessory after the fact prior to trial.

¶3. At trial, Herdicine Marshall (Herdicine), Tavoris Marshall's grandmother with whom he had lived at the time of his murder, testified that when she went to bed on November 11, 2013, Marshall, Gorman, Corderro Walker, Stanley Self, and her then-seven-year-old grandson Kenny were all in her house. A loud noise woke Herdicine up at approximately 2:00 a.m. on November 12, 2013. She ran to her bedroom door and into the living room where she witnessed three individuals exiting Marshall's bedroom, two of whom she could not identify. The third individual was Self. She asked him what was going on, and he responded, "I don't know, Grandma; I don't know." One of the other individuals then pushed her down, and all three of them ran out the front door. She testified that she did not witness any struggle between Self and the other two individuals, nor did she see any gun pointed at Self. She did not witness any force used to remove Self from the house.

2

¶4.     Investigator Robert Graham responded to the scene and testified that he found two .22 shell casings, one near the door and one near the bed where Marshall lay, and one .25 bullet near the loveseat where Gorman lay. He testified that he found Marshall lying on the bed on his back, face up. Gorman was lying on a loveseat wrapped in a comforter. A video game was frozen on the television, and a video game controller was on a beanbag chair in front of the television. Photographs depicting the scene described by Investigator Graham, as well as of the home and the path next to it, were also entered into evidence.

¶5.     Self, who was fourteen years old at the time of the murders, testified that he visited Marshall's home daily to "chill" and play video games. He testified that he was at Marshall's home playing video games around 1:00 or 2:00 a.m. on November 12, 2013, when Marshall was killed. He stated that he, Marshall, and Gorman were in Marshall's small bedroom, and that Gorman was sleeping while Marshall was watching Self play the video game. Self was sitting on the bed near Marshall. Story knocked on the window, and Marshall told Self to go open the front door; Self complied. Story came in and purchased some pills from Marshall. He left, and Marshall told Self to lock the door behind him. When Self went to the door, the knob was twisting, so he let Story, along with Johnson, back in. They all went back to the room, Self sat back down, and then saw that Johnson had a .22 rifle in his hand. Johnson asked Marshall, "where's the check?"[1] Marshall asked where Johnson got the gun. Johnson again asked where the check was, and Marshall responded, asking if Johnson wanted the check. Then Johnson shot Marshall. He also shot Gorman twice with the .22

---

[1]Self testified that "check" meant Johnson wanted money.

3

rifle. Johnson turned toward Self, and pointed the gun at him, but, according to Self, the gun jammed. At that point, Self rushed Johnson, grabbed the gun, and they tussled over it. After the tussle, Self balled himself up on the bed, and Johnson grabbed a pistol from Story. Self ran out of the room. He saw Herdicine coming out of her room, and she asked Self what happened, and he responded, "I don't know," because he was scared. Johnson then pushed Herdicine down, and Self ran out the front door.

¶6.    When Self got outside the house, Johnson grabbed him and told Self that he was coming with them. Self started screaming, "don't kill me," and Johnson told him he was not going to kill Self because Self was Johnson's cousin. Johnson grabbed Self by the shoulder and took him to the car, while Story followed behind them with a shoebox[2] in his hands. Johnson put Self into the car, a brown Chevrolet Malibu; Vaughn was sitting in the driver's seat and Hodges, who was standing outside the car, got into the front passenger's seat. Johnson started yelling that he needed two more shells because two people were not dead, specifically requesting that Hodges give him more shells. Vaughn drove the group to Eastgate, where Vaughn and Hodges got out of the car and starting walking away. Johnson then took the rifle and put it over a fence, and then Story gave Self two pistols and instructed him to put them by the fence; Self complied. Johnson and Story told Self to get back into the car and drive it. Self drove to another house nearby. There, Johnson and Story offered Self marijuana to stay quiet, then Johnson told Self that if he said anything, he would have a friend kill Self. Self told them he would not say anything, and then ran home to find the

_____

[2]The shoebox contained drugs and money belonging to Marshall.

4

police waiting in his yard to arrest him.

¶7.     At the police station, Self gave a statement that he testified was a lie, and at trial he testified that he had lied in his first statement because he was scared.  He was then taken into custody and held in the youth detention center.  He later wrote a second statement, then gave two more statements, which he testified were the truth.  Self also led the police to the disposed guns.  During cross-examination, Self was thoroughly questioned regarding his role with Marshall as an alleged "door worker" for Marshall's drug business, his motivation to lie to protect himself, and his familiarity with the Marshall home and Marshall's personal effects, among other things, congruent with the defense theory that Self and Vaughn committed the murders.

¶8.     Vaughn testified that he was at his house on the afternoon of November 11, 2013, when Johnson called him.  Johnson and Vaughn went to the store in Johnson's car, where Johnson told him that he was "hurting" and needed to "hit a lick," meaning to rob someone. They smoked marijauna, rode around, and went to Marshall's house to purchase drugs. Gorman, Self, and a few other people were at Marshall's house.  After purchasing drugs, Vaughn began driving Johnson's car, while they rode around "smoking and on Xanax." They went to another store and ran into Hodges, who joined them.  They then picked up Story, who was walking.  When they ran out of drugs, they went back to Marshall's house, where Vaughn went in and purchased more drugs.  They then drove around more, until they parked at Shamrock Apartments, where they stayed in the car to do more drugs and to avoid the police.

¶9.     At Shamrock Apartments, Johnson said that he was "ready to hit a lick," and stated that he wanted to rob Marshall. Vaughn said he was not "with him," and Hodges also declined to join the robbery. Story said, "Let's go." At that point, Johnson and Story exited the car and went down a pathway that led to Marshall's home. Johnson had a long black gun with him, and Story had a silver gun on his waist. The next thing Vaughn witnessed was Johnson and Story running back to the car with Self. Story was carrying a shoebox. Story and Johnson put Self in the car, and Self was "hollering," "don't kill me." Commotion occurred in the car, and Johnson told Vaughn to go, because something bad had happened. Vaughn started the car and drove to Eastgate, because he knew no police would be there. While he was driving, he heard Story ask Hodges if he had any bullets to kill Self, and Hodges said he did not. Meanwhile, Johnson stated that they should kill Self, but Johnson also stated that he was not going to kill his little cousin. Once they got to Eastgate, Vaughn and Hodges jumped out of the car and left. Shortly thereafter, Vaughn witnessed Johnson, Story, and Self speeding by, with Self driving. Vaughn and Hodges then called Corderro Walker, who Hercidine testified had been at her home when she went to bed, to come pick them up. Walker took Vaughn home, where his father let him in the house.

¶10.    The next day, Vaughn learned that the police were looking for him, and he turned himself in. Vaughn gave four statements to the police. He admitted that he was not truthful in all of these statements because he was scared. He was "locked up" the entire time when he gave all of his statements to the police. During cross-examination, the defense thoroughly questioned Vaughn regarding his inconsistent statements to the police and his motivation to

6

lie to protect himself, among other things.

¶11.    Investigator George Serio testified that Self was taken to juvenile detention after he was arrested in the early morning of November 12, 2013, and that Vaughn, Hodges, Story, and Johnson were taken to the Bolivar County Sheriff's Department when they were arrested. The two facilities were in different locations. Investigator Serio performed a gunshot residue (GSR) kit on Self.[3]  After Self disclosed the location of the guns, Investigator Serio went to the location identified and recovered a .25 and a .380 by a fence and a .22 Ruger rifle on the other side of the fence in the field.  He also testified that during the two statements that he took, Vaughn was basically begging to clear his name.

¶12.    Several forensics experts testified.  A gunshot residue expert testified that Self's GSR kit found "particles indicative of gunshot residue" on the back of Self's right hand, on the back of his left hand, and on his left palm.  No GSR was found on Self's right palm. However, while the residue found was consistent with GSR, it did not meet each and every factor needed to exclude the residue as coming from another environmental source.  He also testified that three scenarios explain how GSR could get on a person's hands: 1) the person discharged a firearm; 2) the person was in close proximity (approximately two feet) to a discharged firearm; or 3) the person handled something with GSR on it.

¶13.    The medical examiner testified that Marshall had one gunshot wound to the head and classified the wound as consistent with a distant wound, meaning that the gun would have been at least three feet away from Marshall.  She testified that Gorman had two gunshot

_____

[3]GSR kits were not performed on Johnson, Story, Hodges, and Vaughn, because they were arrested beyond the time GSR testing would be reliable.

7

wounds, one to the head and one to the chest, both consistent with a distant gunshot wound.

¶14. A firearms expert testified that she received a .25 pistol, a .380 pistol, a .22 Ruger rifle, nineteen live rounds for the .22 rifle that were not in the rifle when received, three cartridge casings, and several bullet fragments recovered from the autopsies of Marshall and Gorman. She found that two of the casings had "class characteristics" consistent with the .22 rifle, meaning that the caliber and shape of the firing pin were the same. She found that the third casing had the same class characteristics as the .25 pistol. However, the casings contained insufficient individual markings to determine whether they were fired from those particular weapons. The bullet fragments recovered from Marshall's autopsy had class characteristics consistent with the .22 rifle, but had insufficient individual markings to determine whether they were fired from the recovered .22 rifle. The bullet fragments recovered from Gorman's lung had class characteristics consistent with the .22 rifle, but had insufficient individual markings to determine whether they were fired from the recovered .22 rifle. The remaining bullet fragments recovered were too small to make any comparisons. The firearms expert further testified that she did not have any difficulty test firing the .22 rifle, but that once a jam is cleared, a gun should be able to be fired normally. She noted that GSR exits from any opening in a gun, but for the .22 rifle, GSR would mostly come out of two spots: the muzzle and above the trigger.

¶15. A latent print examiner testified that she found no latent prints of value on any of the three guns or two submitted magazines.

¶16. Story and Johnson both produced alibis. Johnson's wife, Jasmine Johnson (Jasmine),

8

testified that Johnson was home with her and his son all night on November 11, 2013, from 4:00 p.m. until 7:00 or 8:00 a.m. on November 12, 2013. She stated that they both went to sleep around 9:00 or 10:00 p.m. on November 11, 2013. She further testified that she would have known had Johnson gotten out of bed after she went to sleep. The State called Bobby Harper, Vaughn's father, as a rebuttal witness. He testified that at 8:30 or 9:00 p.m. on November 11, 2013, he saw Vaughn, Story, Johnson, and Hodges sitting in Johnson's gold Malibu outside a house. On cross-examination, Harper admitted that he only gave the prosecutors this information a few days before trial. He also admitted that shortly after Vaughn was arrested, Harper told a local television station that Vaughn had been home with him at the time Marshall and Gorman were murdered.

¶17. During Self's cross-examination, the defense attempted to introduce photographs of Self with guns, as well as several juvenile adjudications involving Self. The photographs were undated,[4] and appear to be printed screenshots of photographs from an unknown Facebook profile. The court questioned whether the photographs had been authenticated, especially considering the absence of a date, and further questioned whether they were relevant and whether they were more prejudicial than probative. The court ultimately found that the photographs were irrelevant. The court did, however, allow the defense to cross-examine Self regarding whether he had taken photographs with guns. The defense argued that it was entitled to use juvenile adjudications that occurred after this incident to impeach Self's credibility. The court found that the adjudications were inadmissible under Rule 609.

---

[4]The defense admitted that "we don't know when he posted these."

¶18. The jury instructions included an instruction that a witness's testimony may be discredited or impeached with prior inconsistent statements. It also included an instruction that the law regards alleged accomplice testimony with suspicion and distrust. The jury ultimately found Johnson guilty of conspiracy, two counts of capital murder with firearm enhancement, and kidnapping with firearm enhancement.[5] Johnson appeals his convictions, arguing that 1) the verdicts are contrary to the weight of the evidence, and 2) the court erred in excluding the photographs of Self and his juvenile adjudications.

## ANALYSIS

### 1. *Whether the verdicts are against the overwhelming weight of the evidence.*

> In considering whether a verdict is contrary to the overwhelming weight of the evidence, this Court reviews the evidence in the light most favorable to the verdict to determine whether the verdict is so contrary to the overwhelming weight of the evidence that allowing it to stand would amount to an unconscionable injustice. *Little v. State*, 233 So. 3d 288, 2017 WL 4546740 (Miss. Oct. 12, 2017). In reviewing the evidence in the light most favorable to the verdict, the Court must accept the evidence supporting the verdict as true. *Gillett v. State*, 56 So. 3d 469, 504 (Miss. 2010). This Court will reverse a trial court's denial of a motion for new trial only when the trial court abused its discretion. *Id.*

*Cyrus v. State*, 248 So. 3d 760, 761-62 (Miss. 2018). Johnson argues that the testimonies of Self and Vaughn cannot support his convictions because each witness's testimony was improbable, self-contradictory, and unreasonable.

¶19. While uncorroborated accomplice testimony may be sufficient to convict an accused, such uncorroborated testimony is insufficient to support a conviction when the testimony is

---

[5]The jury also found Story guilty of conspiracy, two counts of capital murder with firearm enhancement, and kidnapping with firearm enhancement. It found Hodges guilty of conspiracy, and not guilty of capital murder and kidnapping.

unreasonable, self-contradictory, or substantially impeached. *Osborne v. State*, 54 So. 3d 841, 846 (Miss. 2011). "Only slight corroboration of an accomplice's testimony is required to sustain a conviction." *Id.* at 847. The corroborated testimony must be that portion of the testimony that connects the defendant to the crime. *Id.* The same rule is relevant to the uncorroborated testimony of a witness who, while not an accomplice, is "manifestly interested in absolving himself from guilt and putting blame on defendant." *Mister v. State*, 190 So. 2d 869, 870 (Miss. 1966).

¶20. Weighing witness testimony and determining credibility is the province of the jury. *Osborne*, 54 So. 3d at 846. If the evidence justifies a verdict, this Court must accept that the jury found it worthy of belief. *Gillett v. State*, 56 So. 3d 469, 504 (Miss. 2010). Even assuming that Self's and Vaughn's testimony was inconsistent and arguably substantially impeached,[6] the testimony connecting Johnson and Story to the crimes was not uncorroborated. Testimony must be uncorroborated *and* unreasonable, self-contradictory, or substantially impeached to be insufficient to uphold a conviction. Self's testimony

---

[6]Johnson argues that Self's testimony is unreasonable or improbable because "it is highly unlikely that Stanley did not see the rifle allegedly held by Johnson when Stanley said he let Story and Johnson in Tavoris's house[,]" "it is highly unlikely that the alleged robbers would have shot Kavion Gorman, who was asleep, before they shot Stanley[,]" and it was improbable that Johnson would ask for more ammunition when he had live rounds in each gun. The State counters that, from Johnson asking for ammunition, the jury could reasonably infer that Johnson was attempting to scare Self into silence. It is also a reasonable inference that Self did not see the rifle until he was in the bedroom. It was dark, Story may have entered the residence in front of Johnson, and Self's testimony implies that he walked in front of Story and Johnson into the bedroom, meaning they were behind him and out of his sight. It is also reasonable to infer that Johnson killed Gorman to eliminate any potential witnesses to the crime. While Self's testimony is certainly subject to different inferences and interpretations, it is not unreasonable or implausible.

connecting Johnson to the crimes corroborated Vaughn's testimony, and Vaughn's testimony corroborated Self's testimony. Moreover, Vaughn and Self both explained to some extent why they gave prior inconsistent accounts to the police, both testifying that they were scared. *See **Osborne***, 54 So. 3d at 846-47 (An accomplice provided inconsistent accounts, but he explained his actions at trial, stating that he was scared for the safety of a family member whom the defendant threatened, and his testimony was reasonable, not substantially impeached, and corroborated.). A cautionary jury instruction was given regarding accomplice testimony. Accordingly, it was for the jury to determine what weight and credibility to give the testimony, because the testimony at issue was sufficient to support the verdicts.

*2.* ***Whether the court erred by excluding photographs and juvenile adjudications.***

¶21. This Court reviews the admission or exclusion of evidence for abuse of discretion. ***Newell v. State***, 49 So. 3d 66, 71 (Miss. 2010). Moreover, this Court only reverses a trial court's evidentiary ruling when the error adversely affects a party's substantial right. ***Id.*** Johnson argues that the exclusion of the photographs showing Self holding guns and of Self's juvenile adjudications was detrimental to Johnson's theory of defense.

     *a.*    *Photographs*

¶22. Johnson argues that undated photographs, which appear to be printouts of screenshots from websites, allegedly of Self holding guns are relevant to Self's "lifestyle." The trial court, noting that the photographs were not authenticated, ultimately found that the photographs were not relevant, and were more prejudicial than probative under Rule 403.

¶23. This Court need not examine whether the trial court erred in finding the photographs were not relevant and were more prejudicial than probative. The undated photographs were not authenticated, nor did Johnson attempt any proffer to authenticate them. *See* Miss. R. Evid. 901. "Authentication is a condition precedent to admissibility." ***Smith v. State***, 136 So. 3d 424, 432 (Miss. 2014). Johnson was required to make a prima facie showing of authenticity. ***Id.*** He did not do so. Thus, because the photographs were not authenticated, the trial court did not err in excluding them. ***Id.*** at 432-35.

        b.       *Juvenile Adjudications*

¶24. The trial court refused to allow the defense to cross-examine Self regarding his juvenile adjudications, all of which occurred after November 12, 2013. It found that, since the adjudications occurred after the murders, the adjudications were not necessary to fairly determine the guilt or innocence of the defendants. Johnson argues that he should have been allowed to impeach Self's credibility using these juvenile adjudications. He asserts that the adjudications should have been admitted because Self "was a suspect and had a motive to fabricate." At trial and in its earlier motion to admit the adjudications, the defense merely asserted that the adjudications went to Self's "credibility."

¶25. Rule 609 prohibits the use of juvenile adjudications to impeach a witness (other than the defendant) in a criminal case unless "an adult's conviction for that offense would be admissible to attack the adult's credibility" *and* "admitting the evidence is necessary to fairly determine guilt or innocence." Miss. R. Evid. 609(d). Impeachment based on juvenile adjudications is generally prohibited due to "the wish to free an adult from bearing the

13

burden of a youthful mistake, the informality of youth court proceedings, and the confidential nature of those proceedings." Miss. R. Evid. 609 cmt. The pre-rules practice regarding using juvenile adjudications for impeachment purposes was provided by Mississippi Code Section 43-21-561, which states that "[e]xcept for the right of a defendant or prosecutor in criminal proceedings . . . to cross-examine a witness . . . to show bias or interest, no adjudication shall be used for impeachment purposes in any court." Miss. Code Ann. § 43-21-561(5) (Rev. 2015). This Court has held that Section 43-21-561(5) and Rule 609(d) "serve the same purpose, have the same objective, and although worded differently, provide the same general criterion for a trial judge in exercising his discretion to determine" admissibility of juvenile adjudications. *Bass v. State*, 597 So. 2d 182, 188 (Miss. 1992). Thus, juvenile adjudications may not be used for general impeachment purposes, but may be admissible if they tend to show bias or interest on the part of the witness. Johnson admits that he wanted to use these juvenile adjudications for general impeachment purposes, noting only that the adjudications go to Self's "credibility." This is exactly the type of usage that Rule 609 prohibits. Johnson failed to offer any explanation of what he expected the juvenile adjudications to show, or how the juvenile adjudications would show any bias or interest on the part of Self. *See Bass*, 597 So. 2d at 190-91 (Defense counsel failed to make "any profert of what they expected to show by cross-examining Thompson as to his youth court record, except a generalized statement to show 'bias or interest.' Did they expect to show he had been promised anything to testify? Did they expect to show he wanted to return home from the training school, and thought if he testified for the state he would be shown leniency? None of this was brought

14

to the attention of the circuit judge.").  The trial court did not abuse its discretion by excluding Self's juvenile adjudications.

## CONCLUSION

¶26.    Because the verdicts were not against the overwhelming weight of the evidence, and because the trial court did not abuse its discretion in excluding the photographs and juvenile adjudications, this Court affirms Johnson's convictions.

¶27.    **AFFIRMED.**

   **RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN,  ISHEE AND GRIFFIS, JJ., CONCUR.**