# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00727-COA

**PHILLIP DON LAWSON A/K/A PHILLIP LAWSON**   **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**   **APPELLEE**

DATE OF JUDGMENT:              05/30/2018
TRIAL JUDGE:                  HON. ANTHONY ALAN MOZINGO
COURT FROM WHICH APPEALED:    LAMAR COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                              BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:            HALDON J. KITTRELL
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 10/15/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE J. WILSON, P.J., TINDELL AND LAWRENCE, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1.   A Lamar County jury convicted Phillip Lawson of committing two counts of fondling and one count of statutory rape against his former stepdaughter Sarah.[1]  The Lamar County Circuit Court then sentenced Lawson to concurrent fifteen-year sentences for the fondling convictions and to a consecutive thirty-year sentence for the statutory-rape conviction, with all three sentences to be served in the custody of the Mississippi Department of Corrections

---

[1] Because this case involves allegations of sexual abuse against a minor, we use pseudonyms to protect the identities of the victim and her mother.

(MDOC). The circuit court ordered Lawson's sentence to be served day for day without eligibility for parole or probation and required Lawson to register as a sex offender upon his release from custody.

¶2.     On appeal, Lawson raises the following arguments: (1) the circuit court gave the jury an improper limiting instruction regarding Lawson's prior bad acts; (2) the circuit court allowed an expert witness to improperly bolster Sarah's testimony and credibility; and (3) the circuit court improperly commented on the evidence.

¶3.     Because we find no reversible error, we affirm Lawson's convictions and sentences.

**FACTS**

¶4.     Sarah's mother, Anna, attended high school with Lawson. After losing contact with each other after high school, the two later reconnected through social media. In 2010, Anna lived in Arkansas and was going through a divorce. In January 2011 after her divorce, Anna and her children (Sarah and two younger siblings) moved to Hattiesburg, Mississippi, where Lawson resided. Anna and the children initially lived in an apartment Lawson had before moving into Lawson's home in Hattiesburg (the Hattiesburg house). During the summer of 2011, Lawson, Anna, and Anna's children all moved into a house at Beaver Lake (the Beaver Lake house) in Purvis, Mississippi. Sarah, who had been diagnosed with scoliosis, needed back surgery. In March 2013, Anna and Lawson married, and Lawson added Sarah to his insurance to cover her surgery. Around the same time as the marriage, the family moved to a home in Glenn West (the Glenn West house) in Purvis.

¶5.     Sarah underwent back surgery in May 2013. She spent a week or two recovering in

2

the hospital before returning home, where she continued to be on bed rest for several weeks and to require help walking. After Sarah's surgery, Anna and Lawson's relationship began to deteriorate. Anna and the children eventually moved out of the marital home in January 2014.

¶6. In October 2015, Sarah began to make allegations that Lawson had sexually abused her. Sarah first shared the allegations with her boyfriend. The school counselor then learned of the allegations and spoke to Sarah. The allegations were then reported to a Department of Human Services (DHS) social worker, who in turn relayed the allegations to Investigator David Bullock with the Lamar County Sheriff's Office. Investigator Bullock obtained a copy of DHS's report on the sexual-abuse allegations. After Sarah's forensic interview, Investigator Bullock spoke with Anna, who filed a criminal affidavit against Lawson. Lawson was arrested, and a grand jury indicted him for committing two counts of fondling and one count of statutory rape against Sarah.

¶7. At Lawson's trial, Anna testified that her relationship with Lawson began to deteriorate shortly after Sarah's surgery in May 2013. Anna stated that she and Lawson began to argue about where she had been and what she had been doing. Anna claimed that Lawson became verbally aggressive toward her and, at times, toward her children and that he became physically aggressive toward her in the bedroom. After she and her children moved out of the marital home in January 2014, Anna testified that Lawson and Sarah remained in touch. Anna stated that Sarah would sometimes mention that Lawson had texted her and would show Anna some of the text messages. Anna testified that it seemed as though

3

Lawson initiated most of the contact, but she admitted that she did not scroll through all of the messages. Anna denied ever seeing text messages from Sarah wishing Lawson a happy Father's Day or asking Lawson to come see her (Sarah).

¶8. Anna testified that Sarah shared the sexual-abuse allegations with her a few weeks after Sarah had told the school counselor. Anna testified that Sarah moved out of her house and began living with her boyfriend. According to Anna, the move initially occurred due to "typical . . . mother-daughter fussing, fighting . . . ." Anna stated, however, that Sarah also wanted to talk to someone about the sexual-abuse allegations but did not necessarily want to talk about the abuse with her mother. Anna testified that Sarah also sometimes questioned whether Anna believed her disclosure about the sexual abuse. Anna stated on both direct examination and cross-examination that Sarah did not have a tendency to lie and that Sarah was terrified to lie because of the possible consequences.

¶9. The State next called Robin Bixler, who conducted Sarah's forensic interview. The State tendered Bixler as an expert in forensic interviewing. Lawson's attorney raised no objection to Bixler's expert-witness qualifications. He did, however, raise continuing objections to the admission of Bixler's testimony on the grounds that (1) Sarah was sixteen years old when Bixler interviewed her and was capable of testifying for herself and (2) Bixler would improperly bolster Sarah's trial testimony if Bixler stated that Sarah had "acted consistently" with a sexually abused child. The circuit court overruled the defense's objections and admitted Bixler's testimony. Bixler described Sarah as apprehensive and uncomfortable when they spoke. Despite the discomfort, Bixler stated that Sarah

4

demonstrated an understanding of body parts represented on anatomical diagrams and that Sarah identified on the diagrams those body parts the two discussed during their interview. Bixler provided no testimony about the specific statements, disclosures, or allegations that Sarah made during their interview. Bixler testified, however, that her interview findings were consistent with the allegations of sexual abuse.

¶10.    Sarah, who was nineteen years old at the time of the trial, testified that Lawson began inappropriately touching her soon after her family moved into the Hattiesburg house. Sarah testified that she was watching television in her room one day when Lawson entered and started touching her. Sarah stated that everyone else in her family had gone to grab dinner and that she and Lawson were alone. Sarah began to cry during her testimony and to have difficulty providing verbal answers to the questions. The circuit court allowed the State to produce an anatomical drawing so Sarah could point to the body parts Lawson had touched. Concerned that not all the jurors could see the anatomical drawing, the circuit judge stated, "I'm just going to simply explain to you that she [(Sarah)] pointed to the breast and the vagina area on the diagram . . . ." The defense raised no contemporaneous objection to the judge's statement. When asked what part of Lawson's body had touched her, Sarah pointed to the penis on the male anatomical diagram. She stated that Lawson had touched "both of [her] private areas" with "his private area[,]" had touched her both outside and inside her clothes, and had removed her pants. When asked what happened when Lawson's private area touched her private area, Sarah finally responded that Lawson had raped her. Sarah further testified that, after raping her, Lawson left her room and went outside the house.

5

¶11. Sarah stated that she did not disclose the incident to anyone because Lawson had threatened her. Sarah explained that Lawson was in the military and "was in a position to where he could do anything to anyone." Sarah also testified that Lawson always paid for her phone and would take her phone away when she got into trouble. Anna had earlier testified that Lawson was the one who typically enforced any punishment, such as taking away Sarah's phone and computer or grounding Sarah. Anna described the phone as Sarah's "lifeline" and testified that the punishment Lawson enforced on Sarah sometimes lasted as long as several weeks or a full month.

¶12. According to Sarah, the sexual abuse happened "a lot" at the Hattiesburg house when no one else was around. She later testified that the abuse had occurred about three times a week during the time that her family lived with Lawson. Sarah testified that the family moved to the Beaver Lake house when she was in seventh grade and that the sexual abuse continued there. The family later moved to the Glenn West house. In May 2013, Sarah underwent her back surgery and spent the summer recovering. Sarah testified that Lawson entered her room one day while she was still on bed rest. Although Lawson did not rape her, Sarah testified that he did begin to touch her. When asked to identify the body parts Lawson had touched, Sarah again pointed to the anatomical drawing. The State asked whether Sarah was pointing to the same two body parts that the circuit judge had earlier clarified for the jury. Sarah responded affirmatively to indicate that Lawson had touched both her breasts and vagina. Sarah stated that she and Lawson were both wearing their clothes during the incident and that Lawson was "touching himself" while he touched her. Sarah testified that Lawson

6

was only in her room for a little while and that he had "cleaned up" with towels before he left.

¶13. Sarah stated that the sexual abuse continued during the winter between Christmas 2013 and when her family moved out of the Glenn West house in February 2014 and that it even occurred after her family stopped living with Lawson. According to Sarah, there was a day after her family left the Glenn West house when her mother was on a date and her sister was sleeping, and Lawson entered her bedroom and again raped her. Sarah testified that the abuse stopped after that incident. She admitted, however, that she never disclosed this alleged final incident in her interview with Bixler or in her statement to police. Instead, her statement to police provided that Lawson's abuse had ended once her family moved out of the Glenn West house.

¶14. Sarah also admitted that she remained in weekly contact with Lawson through text messages after her family left the Glenn West house. Sarah explained that Lawson still paid for her phone, which she did not want to lose. Sarah testified that she sometimes texted Lawson to see how he was doing. After being asked to prom, Sarah texted Lawson and sent him a picture. Sarah stated that she sent Lawson the text message about prom because she wanted him to buy her a prom dress. Although she also texted Lawson and asked him to bring her the Christmas presents he had bought for her and her siblings, Sarah testified that her boyfriend was with her when she received the presents from Lawson. Sarah stated that she eventually disclosed Lawson's abuse to her boyfriend a year or two after the abuse had ended. Sarah testified that her boyfriend then relayed the information to his mother.

7

Eventually, the school counselor and DHS learned of the allegations.

¶15.    The circuit court also allowed Lawson's former stepdaughter, Jane,[2] to testify about instances of sexual abuse she suffered during Lawson's relationship with her mother.  The State offered Jane's testimony under Mississippi Rule of Evidence 404(b) to show Lawson's motive, intent, and absence of mistake or accident in sexually abusing Sarah.  Jane testified that she was thirteen when her mother began to date Lawson and that she was sixteen when the two married.  Jane testified about multiple instances where Lawson approached her and offered her money if she would allow him to see her naked and touch her.  Jane stated that the first time she refused Lawson's offer, he gave her $100 and told her not to reveal the conversation to anyone.  Jane stated that Lawson cut off her cell phone the following Monday.  A few weeks later, Jane stated that she again refused Lawson's offer.  Later that same day, Jane testified that Lawson forced her to put on lingerie from Victoria's Secret, pushed her onto her bed, "put his hand in me down there[,]" and tried to make her touch him. Jane stated that Lawson turned her cell phone back on the following day.  Jane testified to other instances where Lawson entered her bedroom and stuck his hand inside her.  Jane stated that Lawson told her no one would believe her if she revealed the abuse.  Jane testified that the abuse lasted for about four months until her mother walked into her bedroom one morning and finally caught Lawson assaulting Jane.

¶16.    Following Jane's direct examination, the circuit court excused the jury.  Outside the

---

[2] Lawson's former stepdaughter was an adult when she testified at his trial, but the alleged sexual abuse that she described occurred when she was a child.  To protect the former stepdaughter's identity, we use a pseudonym in place of her real name.

jury's presence, the circuit judge expressed his opinion to the parties that they had reached "dangerous territory" as far as "the case integrity" was concerned, and he warned the parties against presenting "anything that would prejudice . . . [the jurors] any further." The circuit judge explained:

> I just want to make sure that everybody knows that we want to be careful of tainting or influencing this jury and letting this jury lose focus of whether or not the alleged victim in this particular case was a victim of statutory rape or sexual battery. That's what this case is about. It's not about whether or not the Defendant committed a crime against this witness, and I just want to be clear.

¶17. Lawson's attorney asked the circuit court to give the jury a limiting instruction regarding Jane's testimony. When the jurors returned to the court room, the circuit judge instructed them as follows:

> Thank you for your patience. I have a statement to make to you, and it's worded carefully, so I'm going to read it, but I want you to carefully consider this being an order of the Court. And as you have heard, the allegations in this case—this is a very sensitive case, and I feel impressed to record for the permanent court record the following statement and instruction to you.
>
> This Defendant, Phillip Lawson, is on trial for crimes against [Sarah], specifically two counts of fondling and one count of statutory rape. This particular witness [who is] on the stand now, her testimony is being admitted under a specific rule of court that allows testimony from another person to support the alleged victim's testimony.
>
> Mr. Lawson, the Defendant, has not been convicted nor is he being tried for any allegations made by this witness. You must give whatever weight to this witness'[s] testimony that you assign based on your judgment of her credibility, and you must determine whether or not this witness'[s] testimony supports the alleged victim in this case . . . , which is [Sarah]'s own testimony.
>
> That is the sufficient instruction, and you will be the determiner of that fact.

¶18. The State presented one final witness and then rested its case-in-chief. Angela Lawson, who was married to Lawson at the time of trial, testified on the defense's behalf. Angela began dating Lawson in May 2015. Although she had never met Sarah, Angela testified that she had spoken to Sarah on the phone several times and that Sarah had usually initiated the calls. Angela stated that Sarah had once asked for help or money to buy a car and that the two had spoken multiple times about getting Sarah's family together with Angela's children to meet and play. Angela testified that she had never gotten the impression that Sarah did not want to be around her and Lawson.

¶19. Lawson also testified in his own defense. Lawson stated that, after Anna and her children moved into the Hattiesburg house with him, he developed a good relationship with Sarah and her siblings. After Anna and the children moved out of the Glenn West house in January 2014, Lawson testified that Sarah remained in touch with him through text messages and phone calls. Lawson's attorney introduced into evidence copies of text messages Sarah sent Lawson after her family left the Glenn West house, including messages in which Sarah wished Lawson a happy Father's Day, shared her ACT score and college plans with him, asked him to come to her work to deliver his Christmas gifts for her and her siblings, and told him about being invited to prom. Lawson denied ever touching Sarah inappropriately and stated that he had never seen her in anything less than a bathing suit.

¶20. After considering all the evidence and testimony, the jury found Lawson guilty of two counts of fondling and one count of statutory rape. The circuit court sentenced Lawson to concurrent fifteen-year sentences for each of the fondling convictions and a consecutive

10

thirty-year sentence for the statutory-rape conviction, all to be served day for day in MDOC's custody without eligibility for parole or probation. The circuit court also ordered Lawson to register as a sex offender upon his release from custody. Lawson filed an unsuccessful motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. Aggrieved, Lawson appeals.

## DISCUSSION

### I.    Limiting Instruction

¶21.    For the first time on appeal, Lawson contends that the circuit court gave the jury "a patently incorrect [limiting] instruction" after Jane's testimony. According to Lawson, the limiting instruction prejudiced him "by expressly allowing the jury to consider [Jane]'s testimony as evidence bearing directly on the accusations in the instant case and on the credibility of [Sarah]'s testimony about the charges against Lawson." Because Lawson failed to raise this alleged error before the circuit court, we review the issue for plain error. *See Wilson v. State*, 198 So. 3d 408, 411 (¶7) (Miss. Ct. App. 2016) ("A party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal, because it is otherwise procedurally barred.").

¶22.    "Under the plain-error doctrine, this Court may exercise discretion to correct an obvious error the defendant failed to properly raise—but only where the error affects the defendant's fundamental, substantive rights." *Young v. State*, 271 So. 3d 650, 657 (¶26) (Miss. Ct. App. 2018). We correct such errors only when they "resulted in a manifest miscarriage of justice or seriously affect[] the fairness, integrity, or public reputation of

11

judicial proceedings." *Id.* (internal quotation marks omitted).

¶23.    Under Rule 404(b), "[e]vidence of a wrong act 'is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.'" *Terrell v. State*, 237 So. 3d 717, 731 (¶58) (Miss. 2018) (quoting M.R.E. 404(b)). But Rule 404(b) permits the admission of prior-bad-acts evidence for such purposes "as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." M.R.E. 404(b). "In the context of child-sexual-abuse cases, even evidence of remote past sexual-abuse allegations may be admitted for a proper purpose under Rule 404(b), especially when coupled with an appropriate limiting instruction to the jury." *Shoemaker v. State*, 256 So. 3d 604, 614 (¶36) (Miss. Ct. App. 2018).

¶24.    With regard to our review of jury instructions, Mississippi caselaw holds as follows:

> Jury instructions must be read as a whole to determine if the instructions were proper. Jury instructions must fairly announce the law of the case and not create an injustice against the defendant. This rule is summed up as follows: "In other words, if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law, no error results."

*Sharkey v. State*, 265 So. 3d 151, 156 (¶19) (Miss. 2019) (citations omitted).

¶25.    During Lawson's trial, Jane testified about the alleged sexual abuse Lawson committed toward her. The circuit court allowed Jane's testimony into evidence under Rule 404(b) for the limited purpose of showing Lawson's motive, intent, and absence of mistake or accident in sexually abusing Sarah. After Jane's testimony, the circuit court gave the jury the following limiting instruction:

> This Defendant, Phillip Lawson, is on trial for crimes against [Sarah], specifically two counts of fondling and one count of statutory rape. This

12

particular witness [who is] on the stand now, her testimony is being admitted under a specific rule of court that allows testimony from another person to support the alleged victim's testimony.

Mr. Lawson, the Defendant, has not been convicted nor is he being tried for any allegations made by this witness. You must give whatever weight to this witness'[s] testimony that you assign based on your judgment of her credibility, and you must determine whether or not this witness'[s] testimony supports the alleged victim in this case . . . , which is [Sarah]'s own testimony.

¶26. Lawson raised no contemporaneous objection to the circuit court's limiting instruction. At the conclusion of the parties' testimony and evidence, the circuit court gave Jury Instruction 7, which stated:

[T]estimony from any witness in this trial pertaining to any previous sexual misconduct of the [D]efendant, . . . Lawson, was offered in an effort to show motive, intent, or absence of mistake or accident, regarding the actions of this [D]efendant in the statutory rape and fondling of [Sarah]. You may give this testimony such weight and credibility as you deem proper under the circumstances. However, you must not consider this testimony as proof of guilt of the charge[s] for which he is presently on trial.

¶27. On appeal, Lawson asserts for the first time that the circuit court's limiting instruction failed to restrict Jane's testimony to its proper scope and erroneously allowed the jury to consider Jane's testimony about the alleged prior abuse as evidence that supported Sarah's allegations. While acknowledging that Jury Instruction 7 constituted "a more appropriate limiting instruction[,]" Lawson nevertheless contends that the initial limiting instruction and the subsequent jury instruction hopelessly conflicted and compel the reversal of his convictions.

¶28. Regardless of whether the initial limiting instruction, standing alone, properly instructed the jury as to the limited admissible purpose of Jane's testimony, we find that the

13

jury instructions as a whole fairly announced the applicable caselaw. *See Sharkey*, 265 So. 3d at 156 (¶19). When read as a whole, the instructions informed the jurors that Lawson was not on trial for any alleged prior bad acts; that Jane's testimony was admissible only for the limited purpose of showing Lawson's motive, intent, and absence of mistake or accident in sexually abusing Sarah; and that the jury could not consider Jane's testimony as proof that Lawson had committed the crimes for which he was presently on trial. Both the supreme court and this Court have found such instruction to be in accordance with Mississippi caselaw. *See Gore v. State*, 37 So. 3d 1178, 1184, 1187 (¶¶14, 21) (Miss. 2010); *Shoemaker*, 256 So. 3d at 614 (¶¶39-40). In addition, after reading the jury instructions as a whole, we fail to see that any hopeless conflict arose between the limiting instruction and Jury Instruction 7 as Lawson suggests. We therefore cannot conclude that a "manifest miscarriage of justice" occurred that affected "the fairness, integrity, or public reputation" of Lawson's trial. *Young*, 271 So. 3d at 657 (¶26). As a result, we find this argument lacks merit.

## II. Expert-Opinion Testimony

¶29. Lawson next argues that the circuit court erred by allowing Bixler to testify. According to Lawson, the State used Bixler's testimony to offer an opinion that improperly bolstered Sarah's testimony and credibility. We review a "trial court's admission or suppression of evidence, including expert testimony," for abuse of discretion. *Russell v. Russell*, 148 So. 3d 1052, 1055 (¶13) (Miss. Ct. App. 2014). "[R]eversal will be appropriate only when an abuse of discretion resulting in prejudice to the accused occurs." *Dandass v. State*, 233 So. 3d 856, 865 (¶25) (Miss. Ct. App. 2017).

14

¶30. Lawson's trial attorney raised no issue as to Bixler's expert qualifications in forensic interviewing. He instead raised continuing objections that (1) Bixler's testimony was unnecessary because Sarah, who was sixteen at the time of the interview, was not of tender years when the interview occurred and was capable of testifying for herself at trial and (2) Bixler would improperly bolster Sarah's testimony and credibility if Bixler stated that Sarah had "acted consistently" with a sexually abused child during their interview.

¶31. On appeal, Lawson again raises no dispute as to Bixler's expert qualifications. He also makes no assertions that the State admitted hearsay into evidence through Bixler's testimony. In fact, Lawson acknowledges that "Bixler did not testify about the specific statements, disclosures[,] or allegations that [Sarah] made to [Bixler] during the interview." Bixler described Sarah's demeanor when they met and stated that Sarah conveyed an understanding of body parts shown to her on anatomical diagrams. Bixler provided no further specifics as to the content of the interview, but she stated that her interview findings were consistent with the allegations of sexual abuse. Although Lawson had requested a continuing objection to Bixler's testimony following her voir dire, he made no contemporaneous objection to the specific language of this opinion statement. Nevertheless, it is this opinion that he now argues improperly bolstered Sarah's testimony and credibility.

¶32. "While an expert may not opine that an alleged child sex[-]abuse victim has been truthful, the scope of permissible expert testimony under [Mississippi Rule of Evidence] 702 includes an expert's opinion that the alleged victim's characteristics are consistent with those of children who have been sexually abused." *Elkins v. State*, 918 So. 2d 828, 832 (¶9) (Miss.

15

Ct. App. 2005). As our supreme court has further explained, "[e]vidence that the interviews were *credible*, i.e. capable of being believed, [i]s properly admitted. On the other hand, comments about a witness'[s] *veracity*, i.e. truthfulness, will generally be inadmissible, because of its 'dubious competency.'" *Smith v. State*, 925 So. 2d 825, 838-39 (¶32) (Miss. 2006).[3] Our caselaw clearly cautions, however, that an "expert should not be permitted to pass judgment on whether the *defendant* was the specific perpetrator." *Id.* at 838 (¶31). Based on this caselaw, we find that Lawson's pre-testimony objection to Bixler was not well taken and properly overruled by the circuit court.

¶33. Further, as noted above, Lawson failed to later make a contemporaneous objection to the specific language of Bixler's opinion or to request any limiting instruction. "The failure to object to testimony at trial waives any assignment of error on appeal." *Manning v. State*, 269 So. 3d 216, 220 (¶15) (Miss. Ct. App. 2018). Thus, to any extent that Bixler's testimony strayed beyond what our caselaw allows, we find Lawson waived this alleged error on appeal by failing to make a contemporaneous objection. *See id.* We further find that no plain error occurred because no legal rule requires a trial judge to sua sponte stop or strike arguably objectionable testimony, and whether to object to such testimony remains a trial-strategy matter left to defense counsel's discretion. *See Graham v. State*, 264 So. 3d 819, 821 (¶8) (Miss. Ct. App. 2018); *Pinter v. State*, 221 So. 3d 378, 384-85 (¶12) (Miss. Ct. App. 2017).

---

[3] Our caselaw has routinely held that an expert's opinion about whether a child's behavior patterns are consistent with those of sexually abused children provides admissible testimony as to the child's credibility while an opinion touching on the specific allegations of abuse regarding a particular defendant leans toward a child's veracity. *See Branch v. State*, 998 So. 2d 411, 415 (¶¶14-15) (Miss. 2008); *Smith*, 925 So. 2d at 837-39 (¶¶30-32); *Jones v. State*, 606 So. 2d 1051, 1057-58 (Miss. 1992).

16

We therefore find this assignment of error lacks merit. In so doing, however, we take this opportunity to caution trial attorneys to confine any expert-opinion testimony to the permissible boundaries established by caselaw so they do not risk a reversal on appeal based on the admission of improper expert-opinion testimony.

### III.   Comment on the Evidence

¶34.   In his final assignment of error, Lawson contends that the circuit judge erred by directly commenting on Sarah's testimony "on the critical factual issue of whether Lawson touched her as alleged in the indictment." Because Lawson failed to raise any such objection at trial, we review this argument for plain error. *See Wilson*, 198 So. 3d at 411 (¶7).

¶35.   "Our law of criminal procedure has long perceived dangers in comments upon the evidence." *Robinson v. State*, 247 So. 3d 1212, 1223 (¶17) (Miss. 2018). Mississippi Code Annotated section 99-17-35 (Rev. 2015) specifically provides that "[t]he judge in any criminal cause, shall not sum up or comment on the testimony, or charge the jury as to the weight of evidence . . . ." For instance, the supreme court has repeatedly upheld "the trial court's denial of jury instructions that attempt to tell the jury what weight to assign to the evidence, rather than allowing the jury to make its own credibility determinations." *Robinson*, 247 So. 3d at 1223 (¶17).

¶36.   During Sarah's direct-examination, the State asked her what part of her body Lawson had touched during the initial incident of sexual abuse. Instead of answering verbally, Sarah pointed at the anatomical diagram in front of her, which was one of the same diagrams used during her forensic interview with Bixler. The circuit judge then stated:

17

> I'm going to let the record reflect that the witness, in case the jurors could not see through the Teleprompter what she pointed at, not to assist in any way, just to be clear that the witness—okay.
>
> I don't want the examiner to lead the witness anymore than would be allowable by law. So I'm just going to simply explain to you that she pointed to the breast and the vagina area on the diagram, but that is not the projector. That's only a monitor, just so you know if you couldn't see it.

As discussed, Lawson made no contemporaneous objection to the circuit judge's statement.

¶37. The State asserts in its appellate brief that the circuit judge's statement was no more a comment on the evidence than when a trial judge acknowledges in front of the jury a witness's in-court identification of a defendant. Upon review, we agree that the circuit judge neither impermissibly commented on the weight of the evidence nor improperly instructed the jury as to how it should weigh the credibility of Sarah's testimony. The trial transcript reflects that the jury may not have been able to see which body parts Sarah indicated on the diagram in front of her. Rather than commenting on the weight or credibility of Sarah's testimony, the circuit judge simply clarified for the jury those body parts to which Sarah had pointed. Sarah then proceeded to testify in more detail about Lawson's repeated sexual abuse of her. As the circuit court later instructed, any determinations as to the weight and credibility assigned to each witness's testimony and evidence remained solely in the jury's authority. *See Johnson v. State*, 268 So. 3d 534, 541 (¶20) (Miss. 2019). And we "assume that juries follow the instructions." *Washington v. State*, 957 So. 2d 426, 429 (¶16) (Miss. Ct. App. 2007). Because we conclude that no plain error arose from the circuit judge's statement, we find this assignment of error lacks merit.

**CONCLUSION**

18

¶38.    Finding no reversible error, we affirm Lawson's convictions and sentences.

¶39.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND C. WILSON, JJ., CONCUR. McCARTY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, McDONALD AND LAWRENCE, JJ.**

**McCARTY, J., SPECIALLY CONCURRING:**

¶40.    I agree with the majority that the defendant's conviction must be affirmed.  I write separately to emphasize that the trial court's oral limiting instruction violated Mississippi Rule of Evidence 404(b), yet the instruction was not met with an objection and was later curtailed by a written instruction, thereby minimizing any prejudice.  In the future, the issue can be avoided completely by closely hewing to the procedure outlined in Mississippi Rule of Evidence 105 (effective July 1, 2015).

¶41.    Our Rules of Evidence guide that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  M.R.E. 404(b)(1).  When telling the jury to determine if the testimony "support[ed] the alleged victim in this case," the trial judge directly asked the fact finders to do exactly what the plain language in Rule 404(b) prohibits.  Our law has long held that "[t]he reason for the rule is to prevent the State from raising the inference that the accused has committed other crimes and is therefore likely to be guilty of the offense charged."  *Mitchell v. State*, 110 So. 3d 732, 734 (¶10) (Miss. 2013).  In the oral instruction, the trial court in this case directly linked the witness's story of prior abuse by the defendant.

19

¶42. The trial judge was justifiably sensitive of the prejudicial nature of Jane's testimony about how Lawson had attacked her as a child. While well-intentioned, the limiting instruction provided to the jury mid-trial absolutely violated Rule 404(b) by directly focusing the jury to weigh whether the witness's recollection "support[ed]" the victim's testimony. Counsel for Lawson calls the instruction "patently incorrect," which it is, and the trial court gave that part of the instruction not once—but *twice*.

¶43. While the majority does not need to reach this point in order to resolve the claim of error on appeal, it is important to scrutinize the process so it will not be duplicated. The transcript shows that the trial court sua sponte raised the potential problem with the prior bad acts after Jane testified on direct examination. Out of the presence of the jury, the trial judge noted to the State, the defendant, and the attorneys that this sequence of testimony was in "dangerous territory" since "this Defendant is not on trial for any allegations regarding this witness . . . ."

¶44. After this statement, counsel for the defendant asked, "Your Honor, is there anyway that just for clarification to the jury that you could make that -- that statement?" Counsel wanted to emphasize "that they know he wasn't convicted" for any abuse of the witness. Although not explicitly invoked at trial, this process is covered by Rule 105.

¶45. The trial judge replied, "I'll handle it." After a break, and a sequence off the record, the trial court gave the limiting instruction to the now returned jury. Defense counsel neither objected to the oral limiting instruction nor asked for a mistrial.

¶46. Rule 105 precisely explains how the process should have gone. After request, the trial

20

"court, unless expressly waived or rebutted, shall restrict the evidence to its proper scope, contemporaneously instruct the jury accordingly, and give a written instruction if requested." M.R.E. 105. Built in this process is the guarantee that any limiting instruction will be shaped by the parties just as with any other jury instruction, since "instructions are the advocate's last opportunity to cast legal issues in a light most favorable to his or her client," so long as they are based upon the law and evidence of the case. 2 Jeffrey Jackson, et al., *Mississippi Civil Procedure*, Jury Instructions § 20:1 (2019). The express requirement that the parties have input into the instruction's language is signaled by the caveat that the instruction must be given "unless expressly waived or rebutted." M.R.E. 105.

¶47. This language in Rule 105 further recognizes that sides may have differing views of the law, how the law should be relayed to the jury, or may even decline to have the instruction given. This recognition preserves counsel's wide range of possible trial strategies, since our courts have "recognized on a number of occasions that the defendant may not want such an instruction because it may actually focus the jury's attention on the potentially prejudicial testimony." *Curry v. State*, 202 So. 3d 294, 299 (¶16) (Miss. Ct. App. 2016) (internal quotation marks omitted).

¶48. Any discussion about the proposed instruction should happen on the record, and any objections or concerns should be specific. "Specific objections allow the trial court to correct any mistakes by considering the arguments of the objecting party, reducing the necessity for appellate review." 2 Jeffrey Jackson, et al., *Mississippi Civil Procedure*, Jury Instructions § 20:5 (2019).

21

¶49. We know that defense counsel requested the limiting instruction in this case, but because the other discussions were off the record, we do not know if the limiting instruction was provided to the State and the defense before it was read, or whether it was drafted by the trial court alone or in concert with the lawyers. The record is free of any objection by trial counsel, and in accord with *Curry*, this decision falls within a lawyer's trial strategy.[4]

¶50. Ultimately, the best route is for any limiting instruction to be requested by counsel and, just as in any jury instruction, defined by the input of the lawyers and screened through our precedent. The recent change in the language of Rule 105 does not alter the requirement that a party must first seek the limiter. It is not the role of a trial court "to soften the blow of admitted evidence." 4 Jeffrey Jackson, et al., *Encyclopedia of Mississippi Law*, Limited Admissibility § 33:11 (2d ed. 2018). That role should be performed by an advocate, if that lawyer so chooses. *Id.* To place the burden on the trial court would violate longstanding precedent. *See Giles v. State*, No. 2018-KA-01222-COA, 2019 WL 2590861, at *5 (¶19) (Miss. Ct. App. June 25, 2019) ("Although there is language in Rule 105 that appears to put the burden of immediate correction on the trial court, we do not fault a trial court for not sua sponte interrupting testimony when no party has objected," as this could result in an improper

---

[4] Nor were the two instructions given to the jury in this case necessarily conflicting or contradictory, which would require reversal. *See Elam v. Pilcher*, 552 So. 2d 814, 817 (Miss. 1989) ("It is well settled that it is reversible error to give contradictory or conflicting jury instructions."). The oral limiting instruction gave greater heft to the *credibility* of the witness' story (and whether it "supports the alleged victim in this case"), which plainly violated Rule 404(b). Yet the jury was not instructed *how* this should be used to impact a finding of guilt or innocence. Jury Instruction 7, the written limiter, properly restrained the utility of the witness's narrative by telling the jury that "you must not consider this testimony as proof of guilt of the charge for which he is presently on trial." Absent a conflict in the oral and written instructions, we are not required to reverse.

22

comment upon the evidence.); *see also Brown v. State*, 890 So. 2d 901, 913 (¶36) (Miss. 2004) (In overruling a line of cases requiring the trial court to sua sponte issue an instruction, the Court held that "[t]he rule clearly places the burden of requesting a Rule 404(b) limiting instruction upon counsel.").

¶51.    So the amended Rule 105 must still have an external "trigger" before a limiter is issued whether through objection by a party or a hotly contested admission of evidence. This trigger could happen when a party strenuously objects to prejudicial evidence but is allowed in after weighing the factors in Mississippi Rule of Evidence 403. Rule 105 then naturally comes into play when a trial court would be required to provide the limiter "unless expressly waived or rebutted." M.R.E. 105.

¶52.    The reality is that "[t]rials are often chaotic and sometimes intensely adversarial." *Richards v. State*, 2017-KA-00809-COA, 2019 WL 1771923, at *4 (¶18) (Miss. Ct. App. Apr. 23, 2019). In order to tame this chaos, "[t]he Rules of Evidence are designed to bring order and fair play to the trial process." *Id.* This need does not mean the Rules of Evidence are always seamlessly applied in trials. When dealing with evidence like the admission of other prior bad acts, counsel must, if they so choose, request a limiting instruction under Rule 105 and then either take an active hand in shaping it, vocally waive the instruction, or object on the record to an improper or unwanted limiter. At that point the instruction can be best reviewed on appeal.

**WESTBROOKS, McDONALD AND LAWRENCE, JJ., JOIN THIS OPINION.**

23