**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2018-KA-00464-COA**

**D'BRYUS STORY**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/28/2018 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH III |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | VICKI L. GILLIAM BRANDI DENTON GATEWOOD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: MATTHEW WYATT WALTON |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/05/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., McDONALD AND C. WILSON, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1. A Bolivar County jury convicted D'Bryus Story of one count of conspiracy to commit robbery, two counts of capital murder with a firearm enhancement, and one count of kidnapping with a firearm enhancement. The trial court sentenced Story to serve five years for the conspiracy offense, two life sentences with eligibility for parole[1] for the capital

---

[1] Because Story was seventeen years old at the time he committed the offenses, a hearing was held in accordance with *Miller v. Alabama*, 567 U.S. 460 (2012), where the trial court determined sentencing Story to life without eligibility for parole would be unconstitutional.

murder charges, and twenty-five years for the kidnapping charge with five years suspended. The trial court ordered all sentences to be served consecutively in the custody of the Mississippi Department of Corrections.

¶2. On appeal, Story argues that his trial counsel was ineffective for failing to file post-trial motions regarding the sufficiency and weight of the evidence, failing to object or preserve reversible error on those matters; and cumulative error. Finding no error, we affirm Story's convictions and sentences.

## STATEMENT OF FACTS

¶3. In the early morning hours of November 12, 2013, Tavoris Marshall (Marshall) and Kevion Gorman were shot and killed in the home of Marshall's grandmother, Herdicine Marshall (Herdicine) in Cleveland, Mississippi. Suspects in the murders were Story, Jayvious Johnson, Jamario Hodges, Favian Vaughn, and Stanley Self. After an investigation, Self was released, and the other four individuals were indicted for conspiracy to commit robbery, capital murder with a firearm enhancement, and kidnapping with a firearm enhancement. Story was tried with Johnson and Hodges, while Vaughn pleaded guilty before trial to the lesser charge of accessory after the fact.[2]

¶4. At trial, Officer Frank Caswell testified he was the first police officer on the scene at approximately 2:00 a.m. He interviewed Herdicine, who pointed him to a back bedroom where he found the two male victims' bodies. Marshall had a gunshot wound to the forehead and was lying on his back on a bed. Gorman was shot on the side of his chest. His

---

[2] The jury convicted Johnson of the same crimes as Story, while Hodges was convicted only of conspiracy to commit robbery.

2

body was lying on a nearby love-seat wrapped in a comforter. It was later discovered during his autopsy that Gorman was also shot in the back of the head. There was no sign of a struggle. A video game was on a television screen in the bedroom.

¶5. Herdicine testified that she lived in her house with Marshall, her twenty-six-year-old grandson, and her seven-year-old grandson. Occasionally, Gorman lived there too. Self was also a regular visitor to Herdicine's home; Herdicine told the jury she believed Self came to play video games in Marshall's bedroom. Even though there was a lot of "traffic" that came in and out of her house, Herdicine never questioned Marshall about it. Marshall had not had a job in six months. Herdicine testified that on the evening of November 11, 2013, when she went to bed, Marshall, Gorman, Self, an individual named Corderro Walker, and her younger grandson, were present in her house. Self and Walker were in Marshall's bedroom.

¶6. At approximately 2:00 a.m., a loud noise awoke Herdicine. She ran into the living room where she saw three individuals exiting Marshall's bedroom. She could not recognize two of the individuals, but she knew the third individual was Self. She claimed Walker was not one of the unidentified individuals. Herdicine asked Self what was going on, and he responded, "I don't know, Grandma; I don't know." Then, one of the men coming from Marshall's bedroom pushed Herdicine down forcefully and said, "Come on. Let's go." All three individuals, including Self, ran out of the front door. Herdicine, proceeding to Marshall's bedroom, saw that Marshall and Gorman had been shot. She locked her front door and called 911. She claimed not to see anyone point a gun at Self nor force Self to leave her house, and she did not witness any struggle between Self and the other individuals.

3

¶7. Investigator Robert Graham responded to the scene and canvassed the bedroom, which was "a mess." He found two .22-caliber shell casings—one on the top of a stack of car tire rims and one on the bed next to Marshall's body, as well as a dusty .25-caliber bullet on the floor near the love seat where Gorman's body lay. The shell casings and bullet were collected as evidence and sent to the Mississippi Crime Lab. Photographs of the scene were entered into evidence. During the investigation, three firearms were recovered and sent to the crime lab for testing: one long .22-caliber black rifle with a banana clip, one .380-caliber handgun, and one .25-caliber handgun.

¶8. Self, who was fourteen years old at the time of the murders, testified for the State. He visited the Marshall residence daily to "chill" and play video games. Gorman was often there as well. On November 12 around 1:00 or 2:00 a.m., Self was in Marshall's small bedroom sitting on the bed playing a video game when Marshall and Gorman were shot and killed. Gorman was sleeping on the love seat while Marshall was watching Self play video games.

¶9. Self, the only eyewitness to the robbery and shootings, testified that the following events occurred. While he was playing video games, Story knocked on the bedroom window. Marshall told Self to open the front door and let Story in the house. Self complied and then returned to Marshall's bedroom to continue playing video games. Story came into the bedroom, bought some pills from Marshall, and then left. Marshall instructed Self to lock the front door behind Self. When he tried, the knob twisted. Story, now with Johnson, was at the door; so Self let them in. They walked back to the bedroom where Self sat down

4

and saw that Johnson had a .22-caliber rifle in his hand. Johnson then asked Marshall, "Where's the check?" Self explained to the jury that "check" meant "money." Marshall asked Johnson where he got the gun, but Johnson did not respond. Instead, Johnson again asked, "Where's the check?" Marshall looked up and responded, "You so want the check?" Johnson then shot Marshall in the forehead, turned, and shot Gorman, who was asleep on the love seat, twice. Story was standing behind Johnson during the shootings.

¶10. According to Self, Johnson then turned and pointed the .22-caliber rifle at Self and "clicked the trigger," but it jammed. At that point, Self rushed Johnson, and they tussled over the gun. Self fell back on the bed and balled up, thinking Johnson was going to shoot him. Johnson set down the rifle and grabbed a pistol from Story. Self then ran out of the bedroom toward the front door. He ran into Herdicine coming out of her room, who asked what happened. Self responded, "I don't know." At that time, Johnson and Story were coming out of the bedroom into the hallway. Johnson pushed Herdicine down, and Self ran outside the house, where Johnson grabbed him by the collar and said, "You're coming with us." Self started screaming, "Don't kill me." Johnson responded that he would not kill Self because Self was his cousin. Self stated that Johnson dragged him by the shoulders to the vehicle with Story following behind them with a "Jordan" shoe box in his hands. Since Self hung out at the house daily, he knew that Marshall kept drugs and money in the shoe box. Johnson put Self in the backseat of a brown Chevrolet Malibu. Vaughn was in the driver's seat, and Hodges, who was standing outside of the vehicle, got in the front passenger's seat. Johnson yelled for Hodges to give him more shells because "two people ain't dead." Self

5

took this statement to mean Herdicine and himself. Hodges refused to give Johnson more shells.

¶11. Vaughn drove the five men to the Eastgate area, where Vaughn and Hodges exited the vehicle and walked away. Johnson threw the rifle over a fence. Story gave Self the two pistols and told him to put them by the fence, and Self complied. Johnson and Story told Self to get back in the vehicle and drive to a nearby friend's house, where Johnson and Story offered Self marijuana to keep quiet. Story and Johnson then sorted out the money and drugs that were in the shoe box at the back of the vehicle. Johnson threatened that if Self told anyone about the crimes, Johnson would have Self killed. Self agreed he would not say anything and ran home, where police were waiting to arrest him. Self reiterated to the jury that Story and Johnson took him by force at gunpoint from Marshall's home.

¶12. Self was brought in for questioning by Officer George Serio, who performed a gunshot residue test on Self which came back positive. During cross-examination, the defense questioned Self on matters consistent with their theory that Self and Vaughn committed the murders. Self testified that he handled both pistols in the palm of his hands before he put them by the fence, and when he tussled with Johnson over the .22-caliber rifle. He admitted to hanging out at the "drug house" (Herdicine's home) but denied being the "doorkeeper," even though he locked and unlocked the door "a few times" for people coming to buy drugs. Self explained that individuals wanting to buy drugs would call Marshall ahead of time. In exchange for cash or marijuana, Self performed various chores around the house. At the police station, Self gave his first of three statements, which was

6

discovered to be a lie. At trial, Self explained that he lied because he had been threatened and was scared. Self also told police where the guns were located.

¶13. At trial, Vaughn testified for the State and related the following version of events. On the afternoon of November 11, 2013, Johnson called Vaughn, and they went to a convenience store in Johnson's Malibu. Johnson told him he was "hurting" and needed to "hit a lick," meaning rob someone. They rode around Cleveland smoking marijuana, and then decided to go to Marshall's house to buy some Xanax. At that time, Gorman, Self, and a few other individuals were at Marshall's house. After the drug purchase, Vaughn began driving Johnson's car, and they continued riding around town, smoking marijuana and taking Xanax until after dark. They ran into Hodges at another convenience store. He joined them, and they later picked up Story. The group proceeded to drive around and take drugs until they ran out. They decided to return to Marshall's house, where Vaughn went in to purchase more drugs. Then they parked at the Shamrock Apartments "to chill" and avoid police. Johnson declared he was "ready to hit a lick" and wanted to rob Marshall, whose house was nearby. Vaughn and Hodges said they were not interested. Story, however, responded, "Let's go."

¶14. Johnson and Story then exited the vehicle, armed. Vaughn stated Johnson had a long black gun with him, while Story had a silver gun on his waist. They walked down a path that led to Marshall's home. Vaughn testified that the next time he saw Johnson and Story they were running back to the Malibu with Self. Story was carrying a shoe box, and Johnson had the long gun. Story and Johnson put Self in the backseat of the car, with Self "hollering

7

'don't kill me.'" Johnson instructed Vaughn to start driving because "something bad happened." Vaughn drove to Eastgate because he knew no police would be there. As Vaughn drove, he heard Story ask Hodges if he had any more bullets in order to kill Self. Hodges responded that he did not. Once in Eastgate, Vaughn and Hodges jumped out of the vehicle and left. Soon after, Vaughn saw Johnson, Story, and Self speeding by with Self driving. The next day, Vaughn turned himself in after he discovered from his father that the police were looking for him. While in custody at the county jail, Vaughn gave four statements to the police but admitted at trial that he was not truthful in all of them because he was scared. During cross-examination, Vaughn agreed that he struck a deal with prosecutors, pleading guilty to a lesser charge than capital murder in order to prevent going to prison for life.

¶15. Chief Investigator George Serio testified that after his arrest, Self was taken to juvenile detention while Story, Johnson, Hodges, and Vaughn were taken to the county jail. Officer Serio performed a gunshot residue test only on Self because too much time had passed to test the others reliably. Self told Officer Serio where the guns were located. A .25-caliber automatic handgun and a .380-caliber automatic handgun were recovered near a fence, as well as a .22-caliber rifle in a field near the fence. As part of his investigation, Officer Serio interviewed Self, Herdicine, and Vaughn at the police station.

¶16. Several forensic experts testified for the State, including a gunshot-residue expert, a fingerprint expert, and a medical examiner. The gunshot-residue expert testified that Self's test results showed "particles indicative of gunshot residue" on the backs of both hands and

8

the palm of his left hand. While these findings were "consistent with particles present in gunshot residue," the results could not exclude the possibility that the particles were from "other environmental sources." The expert testified that if a person were to tussle with another person who had recently fired a gun, gunshot residue could be transferred to the other person. Ultimately, he could not say how gunshot residue was on Self's hands.

¶17. The medical examiner who performed the autopsy on Marshall and Gorman testified that Marshall's gunshot wound to the head was consistent with a distant wound of at least three or four feet away, as were Gorman's gunshot wounds to the head and chest. A firearms expert testified that the three cartridge casings had similar "class characteristics" to the .22-caliber rifle and the .25-caliber pistol; however, she could not say that the shells were fired from the specific guns recovered. The expert also testified that while the bullet fragments retrieved from Marshall's brain and Gorman's lung had the same class characteristics as the .22-caliber rifle, there were insufficient markings to conclude they came from that particular rifle. She also test fired without difficulty the .22-caliber rifle which Self said had "jammed"; however, she testified once a jam is cleared a gun will fire normally.

¶18. For their defense, Story and Johnson produced alibis. Story's mother, Shanta Story, testified that she was home the evening before the incident. On November 11, 2013, at approximately 6:00 p.m., Story stopped by her house to retrieve a phone charger. Shanta told him to be home by his curfew. She woke up at approximately 12:30 a.m., and Story was in his bed sleeping; so she locked the door. Shanta woke up the next morning around 6:00

9

a.m. and found her son still asleep in his bed. Police arrested Story at 3:00 p.m. that day. On cross-examination, Shanta admitted that her brother lives in the house, has a key, and can let Story in and out of the house.

¶19. Marquis Jones, a long-time friend of Story's since the eighth grade, testified that he was with Story all day on November 12, 2013, until Story was "picked up" at Story's house. On cross-examination, Jones testified that the night before, he and Story came home at approximately 11:00 p.m. Story's uncle let them in, and they stayed up all night. Jones claimed they did not leave the house until the police came the next day. On rebuttal, the State called Vaughn's father. He testified that on November 11 at approximately 9:00 p.m., he saw Vaughn, Story, Johnson, and Hodges sitting in Johnson's Malibu outside the house of Hodges's girlfriend. Both the State and the defense then finally rested.

**ANALYSIS**

¶20. Story, represented by different counsel on appeal, argues that he received ineffective assistance of counsel due to his trial counsel's failure to file any post-trial motions on his behalf.[3] Story contends this failure prejudiced him because the State failed to present sufficient evidence to support convictions for each of his charges, and the guilty verdicts were against the overwhelming weight of the evidence. Relatedly, Story claims ineffective assistance of counsel as to any procedural bars for failing to object or properly preserve reversible error for these matters. Finally, Story argues if these errors standing alone are

---

[3] Presumably, this failure would include a motion for judgment notwithstanding the verdict (JNOV) and a motion for a new trial. However, it is unclear from Story's brief if he is challenging both the sufficiency of the evidence and the weight of the evidence. To be thorough, however, we will address both.

insufficient to warrant reversal, cumulative errors justify a new trial.  First, we will address Story's ineffective-assistance-of-counsel claim, then relatedly the lack of merit to any evidentiary post-trial motions, and finally, cumulative error.

## I.      Ineffective Assistance of Counsel

¶21.    As a preliminary matter, we must first determine if Story's ineffective-assistance-of-counsel claim is best raised here or in post-conviction-relief proceedings.  The general rule is that "ineffective[-]assistance[-]of[-]counsel claims are more appropriately brought during post-conviction proceedings."  *Parker v. State*, 30 So. 3d 1222, 1232 (¶36) (Miss. 2010).  However, such a claim may be raised and addressed "on direct appeal if the presented issues are based on facts fully apparent from the record."  *Id.*  Since Story's claim is based on facts in the record, we will address the merits of his claim.

¶22.    The ineffective-assistance-of-counsel standard is well established.  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to prove trial counsel was ineffective, the defendant must show that counsel's performance was deficient, and the deficiency prejudiced the defense.  *Pace v. State*, 242 So. 3d 107, 117 (¶27) (Miss. 2018) (citing *Strickland*, 466 U.S. at 687).  To show deficient performance, a defendant must prove that counsel's performance "fell below an objective standard of reasonableness."  *Id.* (citing *Srickland*, 466 U.S. at 688).  Prejudice is demonstrated by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of

11

the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694). "[The reviewing court] looks at the totality of the circumstances to determine whether counsel's efforts were both deficient and prejudicial." *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995).

¶23. Story relies upon *Woods v. State*, 242 So. 3d 47 (Miss. 2018), where the defendant made a similar argument—that trial counsel's failure to file a post-trial motion for a new trial waived the defendant's right to challenge the weight of the evidence on appeal. *Id.* at 58 (¶46). The Mississippi Supreme Court found that there was "[n]o strategic reason" for trial counsel not to file a motion for a new trial, and this failure constituted deficient performance. *Id.* at (¶50). The court went on to consider whether a reasonable probability existed for the trial court to grant the motion and, based upon the specific evidence of that case, found it did.[4] *Id.* at 61 (¶60). Therefore, the court reversed the defendant's conviction and remanded for a new trial. *Id.* at 62 (¶62). The supreme court pointed to three other cases where trial counsel's failure to make post-trial motions challenging the sufficiency or weight of the evidence constituted deficient performance—*Holland v. State*, 656 So. 2d

---

[4] This outcome is necessarily fact driven. In *Woods*, Casey Woods was indicted on a charge for first-degree murder stemming from the shooting of his girlfriend Doris's estranged husband. The three individuals had engaged in an argument that escalated to violence in Doris's driveway. *Id.* at 51 (¶1). The jury was instructed on first- and second-degree murder, heat-of-passion manslaughter, justifiable homicide, and the Castle doctrine. *Id.* at 53-54 (¶¶22-23). The jury convicted Woods of second-degree murder. *Id.* at 53 (¶22). In reversing Woods's conviction, the supreme court stated that if the trial court had been presented with a motion for a new trial, the court could have evaluated the applicability of the Castle doctrine and found that there was a reasonable probability Woods did not have a duty to retreat, and therefore the verdict was contrary to the overwhelming weight of the evidence. *Id.* at 61 (¶¶59-60).

12

1192 (Miss. 1995); *Parker v. State*, 30 So. 3d 1222 (Miss. 2010); and *Giles v. State*, 187 So. 3d 116 (Miss. 2016). *Woods*, 242 So. 3d at 58 (¶50). We will discuss each case in turn.

¶24. In *Holland*, as here, after the presentation of all the evidence, defense counsel completely failed to make any challenge to the sufficiency of the evidence by renewing the motion for a directed verdict; counsel also failed to request a peremptory instruction. *Holland*, 656 So. 2d at 1197-98. Defense counsel later failed to move for JNOV or challenge the weight of the evidence in a motion for a new trial. The supreme court stated, "Although the failure to raise these objections certainly does not render counsel's performance ineffective in every case, it did so [here]." *Id.* at 1197. The supreme court explained that the defendant's trial strategy was to admit guilt to possession of a controlled substance but argue that the evidence was insufficient for the intent-to-distribute element. *Id.* While this strategy was not deficient, the supreme court held that counsel's failure to object to the sufficiency of the evidence deprived the trial judge of the opportunity to review the sufficiency of the evidence. *Id.* at 1197-98. Further, there was a reasonable probability the trial judge would have granted the motion. *Id.* at 1198. The deficiency "was intensified by the resulting failure to preserve critical error on appeal." *Id.*

¶25. In *Parker*, defense counsel's failure to challenge the weight of the evidence was found deficient, and in *Giles*, defense counsel's failure to challenge the sufficiency and weight of the evidence was deficient. *Parker*, 30 So. 3d at 1235 (¶48); *Giles*, 187 So. 3d at 125 (¶33). However, only in *Holland* was the deficiency found to be so prejudicial to the defendant as to warrant reversal based on ineffective assistance of counsel. *Holland*, 656

13

So. 2d at 1198. The defendants in *Parker* and *Giles* could not demonstrate that this deficiency prejudiced them because there was no reasonable probability that the trial court would have granted the motions. *Parker*, 30 So. 3d at 1235 (¶49); *Giles*, 187 So. 3d at 125 (¶33).

¶26. Most recently, in *Pace*,[5] the supreme court cited *Holland*, *Parker*, and *Giles* for the proposition that the failure of trial counsel to file post-trial motions challenging the sufficiency and weight of the evidence constitutes deficient performance, as there was no strategic reason for counsel's failure to file such motions. *Pace*, 242 So. 3d at 118 (¶31). However, the court found no reasonable probability that the trial court would have granted the motions based on ineffective assistance of counsel. *Id.* at 119 (¶34).

¶27. As the supreme court stated in *Holland*, we cannot say that failure to raise these challenges would always render counsel's performance deficient, but it did so here. Story's counsel moved for a directed verdict challenging the sufficiency of the evidence at the end of the State's case-in-chief, which the trial court denied. However, Story did not renew his motion for a directed verdict, request a peremptory instruction, or later file a motion for JNOV. He also did not file a motion for a new trial challenging the weight of the evidence. As in the previously discussed cases, there was no strategic reason for defense counsel not to file these motions; thus, this failure amounts to deficient performance. However, Story must also satisfy the second prong of *Strickland* and show that he was prejudiced by this deficiency. *Giles*, 187 So. 3d at 125 (¶33). He fails to do so. As will be discussed in the

---

[5] *Pace* was decided a few months after *Woods*.

14

next section, there was no reasonable probability that the trial court would have granted the motions. In addition, Johnson, who was tried with Story and also convicted of the same crimes, filed a post-trial motion challenging the sufficiency and weight of the evidence, which the trial court denied. The Mississippi Supreme Court recently affirmed Johnson's convictions on appeal. *Johnson v. State*, 268 So. 3d 534, 543 (¶26) (Miss. 2019), *reh'g denied* (May 9, 2019).

¶28. Story's ineffective-assistance-of-counsel claim for failure to file post-trial motions is without merit because even assuming this failure constituted deficient performance, there was no prejudice to Story because there was no reasonable probability the trial court would have granted the motions. *Giles*, 187 So. 3d at 126 (¶33). Moreover, there can be no ineffective assistance of counsel for failing to preserve reversible error if there is no merit to these evidentiary challenges.

## II. Sufficiency and Weight of the Evidence

¶29. Story attempts to show prejudice resulting from lack of post-trial motions by claiming the jury verdicts were against the sufficiency and weight of the evidence. Story complains that the State presented insufficient evidence for the jury to find beyond a reasonable doubt that he engaged in conspiracy to commit robbery, capital murder, and kidnapping. Moreover, Story argues the verdict is contrary to the overwhelming weight of the evidence. We disagree.

¶30. The law on the sufficiency and weight of the evidence is well known. "A directed verdict, [JNOV,] and a request for peremptory instruction all challenge the legal sufficiency

15

of the evidence presented at trial." *Woods*, 242 So. 3d at 54 (¶24). "[T]he critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed." *Swanagan v. State*, 229 So. 3d 698, 703 (¶18) (Miss. 2017) (quoting *Fagan v. State*, 171 So. 3d 496, 503 (¶36) (Miss. 2015)). The reviewing court "must accept as true all credible evidence consistent with guilt" and give the State "the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Cowart v. State*, 178 So. 3d 651, 666 (¶41) (Miss. 2015). "A motion for a new trial challenges the weight of the evidence." *Woods*, 242 So. 3d at 59 (¶51). The reviewing court must "weigh the evidence in the light most favorable to the verdict" and "only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017).

### A. Sufficiency of the Evidence

¶31. Story argues there was insufficient proof to convict him of the crimes. Instead, Story claims he was convicted due to "guilt by association."

#### 1. *Conspiracy to Commit Robbery*

¶32. Story contends the evidence was not "definitive" that he participated in a conspiracy to commit robbery. Instead, he argues the State merely proved Story was present during the crime and did not take steps to prevent it.

¶33. Under Mississippi law, a conspiracy occurs if two or more persons conspire to commit a crime. Miss. Code Ann. § 97-1-1(1)(a) (Rev. 2014). "[N]o express agreement is

required; an agreement can be inferred from the surrounding circumstances, such as the 'declarations, acts and conduct of the alleged conspirators.'" *Graham v. State*, 120 So. 3d 382, 387 (¶19) (Miss. 2013) (quoting *Barnes v. State*, 493 So. 2d 313, 315 (Miss. 1986)). "[P]articipation in a conspiracy may be proved entirely by circumstantial evidence." *Id*. (citing *Davis v. State*, 485 So. 2d 1055, 1058 (Miss. 1986)). "However, [t]here must exist some evidence that a defendant has associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed." *Id.* (internal quotation marks omitted). The Mississippi Code defines robbery as follows: "Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery." Miss. Code Ann. § 97-3-73 (Rev. 2014).

¶34. The State proved by Vaughn's testimony that Story replied "[l]et's go" when Johnson declared he was "ready to hit a lick" and rob Marshall. Story and Johnson then exited the vehicle and went down the pathway to Marshall's home with firearms on their persons. By these actions, it is abundantly clear that Story intended to associate himself with Johnson in the robbery of Marshall.

¶35. Moreover, Story was not only present during the commission of the robbery, but he also helped bring it about. Self testified that Story had initially knocked on the window to Marshall's bedroom in order to purchase drugs. Story was also "casing the joint" and saw the shoe box where Marshall kept the drugs and money. Story could also see who was in

17

Marshall's bedroom and if any person was armed. He then returned a second time with Johnson. In the bedroom, Self noticed that Story, who was standing behind an armed Johnson, also had a gun and did nothing to stop the crime. After Johnson shot Marshall and Gorman, Self saw Story was carrying a "Jordan" shoe box, which he knew was where Marshall kept his money and drugs. Later, Self observed Story and Johnson both sorting the money and drugs from the shoe box at a nearby friend's house.

¶36. Just because the robbery was not initially Story's idea does not mean there was insufficient evidence to convict Story of conspiracy to commit robbery. Certainly, Story had more involvement than mere "presence" by associating himself with Johnson's plan and by helping bring about the robbery by investigating the situation in Marshall's bedroom before the actual robbery. During the initial drug purchase, Story learned where the money and drugs were kept before returning to Marshall's bedroom with Johnson, armed.

¶37. The above evidence, viewed in the light most favorable to the State, is ample to prove Story conspired with Johnson in the robbery of Marshall.

### 2. *Capital Murder*

¶38. Story claims there was insufficient evidence to prove he actually killed Marshall and Gorman while engaging in the robbery or even "agreed or intended to assist" Johnson in killing the victims. However, proof that Story shot or assisted in shooting the victims is not necessary to convict Story of capital murder.

¶39. Story was charged with two counts of capital murder with the underlying felony being robbery. Section 97-3-19(2)(e) (Rev. 2014) of the Mississippi Code Annotated provides:

18

"[t]he killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of . . . robbery." The Mississippi Supreme Court has stated that "[u]nlike other sections of the capital murder statute, [s]ubsection 2(e) does not require the prosecution to prove the elements of murder, only that the killing took place while the accused was 'engaged in the commission' of the enumerated felonies." *Layne v. State*, 542 So. 2d 237, 243 (Miss. 1989). Accordingly, while in the previous discussion we found the evidence sufficient for conspiracy to commit robbery, now we must find the evidence sufficient to prove Story's participation in the crime of robbery.

¶40. Additionally, for Story to be guilty of capital murder, it is not necessary to prove he committed the robbery himself, only that he acted in concert with Johnson or aided and abetted Johnson in robbing Marshall. *Sneed v. State*, 31 So. 3d 33, 41 (¶24) (Miss. Ct. App. 2009). It is well established that "any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an 'aider and abettor' and is equally guilty with the principal offender." *Id*. (quoting *Jones v. State*, 710 So. 2d 870, 874 (¶15) (Miss. 1998)). In order to be held criminally liable as an aider and abetter in the commission of a felony, one must "do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime. . . ." *Id.* (quoting *Scarborough v. State*, 956 So. 2d 382, 386 (¶21) (Miss. Ct. App. 2007)).

¶41. The jury was properly instructed on aiding and abetting in the commission of the underlying felony of robbery. The jury was instructed that Story would be guilty of capital

murder with a firearm enhancement if Story "individually or while aiding and abetting and/or acting in concert with [the other defendants] and/or others, did unlawfully, wilfully and feloniously, without authority of law, and with or without deliberate design to effect death, kill" Marshall and Gorman, "while . . . engaged in the commission of robbery . . . with the use of a firearm." The jury was also properly instructed on general aider and abetter culpability by an instruction using identical language adopted by the Mississippi Supreme Court in *Milano v. State*, 790 So. 2d 179, 185 (¶21) (Miss. 2001):[6]

> *The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged.* The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by that person through the direction of another person as his or her agent, *by acting in concert with*, or under the direction of, another person or persons in a joint effort or enterprise.
>
> If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.
>
> Before any defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.
>
> Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.
>
> In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these

---

[6] The *Milano* court, in turn, adopted the pattern jury instruction of the United States Court of Appeals for the Fifth Circuit. *Id.* (citing Fifth Circuit Pattern Jury Instructions (Criminal) 2.06 Dist. Judges Assoc. (1998)).

instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the intent to violate the law.

(Emphasis added).

¶42. Indisputably, the evidence shows Johnson, not Story, was the individual who shot and killed Marshall and Gorman. However, there was sufficient evidence to show Story acted in concert or aided and abetted Johnson in robbing Marshall during which activity Marshall and Gorman were shot and killed. After Story initially observed the layout of Marshall's bedroom with his first purchase of Xanax pills, thereby seeing the shoe box where Marshall kept the drugs and money, Story and Johnson returned armed. Testimony shows Story accompanied Johnson into the Marshall home with the intent to assist Johnson in the robbery. According to Self, when he returned to lock the front door after Story's first visit, the knob twisted, and Story entered the house with Johnson. All three individuals walked back to Marshall's bedroom. Self said Story stood behind Johnson, armed, as Johnson asked Marshall where the money was. When Marshall did not respond, Johnson shot him and Gorman. According to our standard of review, there was sufficient proof beyond a reasonable doubt that Story was acting in concert with Johnson to effect the robbery, during which Marshall and Gorman were killed.

### 3. *Kidnapping*

¶43. Story asserts that there was no evidence presented that he kidnapped Self on November 12 but instead that Johnson did. Again, however, under aider and abettor culpability, as explained in the previous discussion, Story does not need to be the individual who actually kidnapped Self to be found guilty of the charge.

21

¶44. Kidnapping is defined as follows: "Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will . . . ." Miss. Code Ann. § 97-3-53 (Rev. 2014). The jury received an instruction stating that if from the evidence they found beyond a reasonable doubt that Story "individually or while aiding and abetting and/or acting in concert with [the other defendants] and/or others did unlawfully, wilfully and feloniously and without authority of law, forcibly seize and confine Stanley Self, a human being, against his will" with the use of a firearm, he would be guilty of kidnapping with a firearm enhancement.

¶45. The evidence was sufficient to show that Story aided and abetted Johnson in Self's kidnapping. Self testified that Johnson pointed the gun at him after murdering the two victims, but when Johnson pulled the trigger, the gun jammed. After Self and Johnson tussled, Story assisted Johnson by giving Johnson another firearm off his person. Johnson grabbed Self by the collar with force and said, "You're coming with us." Johnson then dragged Self by the shoulders to the Malibu and confined him in the back seat. Self testified that Story was accompanying Johnson the entire time, following behind them with the stolen shoe box. Both Johnson and Story were still armed. Self stated he feared for his life and screamed, "Don't kill me." Story, Johnson, and Self were all in the back seat of the Malibu, where Self believed Johnson was going to kill him because Johnson requested more gun shells from Hodges because "two people ain't dead." Vaughn also corroborated this request. According to Self, after they arrived at the friend's house in Eastgate, Johnson and Story

22

sorted the contents of the shoe box at the back of the vehicle. After Johnson threatened Self with his life if he "told," Self ran home.

¶46. The testimony of Self and Hodges is sufficient for a trier of fact to find beyond a reasonable doubt that Story aided and abetted Johnson in kidnapping Self. Story deliberately accompanied Johnson the entire time Self was held against his will. Johnson forcibly seized Self from the crime scene and put him into the Malibu. There, Self was confined against his will in the back seat between Story and Johnson while they drove to Eastgate. Self claimed he was held at gunpoint and feared for his life. Self continued to be held against his will at the house where Story and Johnson examined the contents of the stolen shoe box. It was not until after Johnson threatened Self with his life that Self was released and ran home. Upon review, this evidence is sufficient to show Story aided and abetted Johnson in the kidnapping of Self.

## B.    Weight of the Evidence

¶47. Story argues that the weight of the evidence was insufficient for each of the convictions, and he therefore should be granted a new trial for the same reasons discussed above regarding the sufficiency of the evidence. We disagree.

¶48. Viewing the evidence in the light most favorable to the verdict, we cannot say that the jury's finding Story guilty of conspiracy, capital murder, and kidnapping was so contrary to the overwhelming weight of the evidence that allowing it to stand sanctions an unconscionable injustice. The defense's strategy was to place the blame for the murders on Self and Vaughn. Admittedly, both Self and Vaughn lied to law enforcement in initial

23

statements about the events that transpired surrounding the crimes. However, the "jury is the sole judge of the weight of the evidence and the credibility of the witnesses, and jurors may choose to believe one witness over another." *Renfro v. State*, 118 So. 3d 560, 564 (¶14) (Miss. 2013). The jury found the weight of the evidence presented against Story sufficient to convict him of the crimes charged. Story actively associated himself in each of Johnson's crimes, from his enthusiastic "[l]et's go" in response to Johnson's announcement he wanted to "hit a lick" and rob Marshall, through the actual robbery and murders, and concluding with kidnapping Self, the only witness to the crimes. While Story presented alibi witnesses, their testimonies conflicted, and the jury decided the witnesses were not credible. Story's mother testified he was asleep all night in his bedroom, while Jones stated they stayed up all night in the living room. Finally, Vaughn's father testified that he saw Story, Vaughn, Johnson, and Hodges sitting in the Malibu that night. The jury's verdict was not against the overwhelming weight of the evidence; accordingly, this issue is without merit.

### III.  Cumulative Error

¶49.    Lastly, Story requests that if any trial errors standing alone are insufficient to warrant a new trial, we consider the prejudicial effect of cumulative error. "[I]ndividual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007). However, "[w]here there is no error in part, there can be no reversible error to the whole." *Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007)). Here, there were no errors in part, and therefore no

cumulative error.

¶50.   **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**